UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CHARLENE MORISSEAU,

                              Plaintiff,

      -against-

DLA PIPER f/k/a DLA PIPER RUDNICK
GRAY CARY U.S. LLP f/k/a PIPER RUDNICK LLP,
ROBERT FINK, ESQ.,  JOSEPH FINNERTY III, ESQ.,
JOSEPH FINNERTY JR., ESQ.,
LEROY INSKEEP, ESQ., DENISE KABACK,
AARON KATZ, ESQ., HEIDI LEVINE, ESQ.,
MARILLA OCHIS, ESQ., PETER PANTALEO, ESQ.,
DOUGLAS RAPPAPORT, ESQ.
and AMY SCHULMAN, ESQ.,

                           Defendants.

-------------------------------------------------------------------X

Case No. 06 Civ.

**COMPLAINT**

JURY TRIAL DEMANDED



Plaintiff, Charlene Morisseau ("Plaintiff" or "Ms. Morisseau"), by her attorneys, Ballon Stoll Bader & Nadler, P.C., complaining of the defendants, DLA Piper f/k/a DLA Piper Rudnick Gray Cary f/k/a Piper Rudnick LLP ("Piper Rudnick" or "the Firm"), Robert Fink, Esq. ("Fink"), Joseph Finnerty III, Esq. ("Finnerty III"), Joseph Finnerty Jr., Esq. ("Finnerty Jr."), Leroy Inskeep, Esq. ("Inskeep"), Denise Kaback, Esq. ("Kaback"), Aaron Katz, Esq. ("Katz"), Heidi Levine, Esq. ("Levine"), Marilla Ochis, Esq. ("Ochis"), Peter Pantaleo, Esq. ("Pantaleo"), Douglas Rappaport, Esq. ("Rappaport"), and Amy Schulman, Esq. ("Schulman") (collectively, the "Defendants"), alleges as follows:

### JURISDICTION AND VENUE

1.    This is an action brought to remedy racially based harassment and discrimination against Ms. Morisseau, hostile work environment, disparate impact discrimination against minorities at Piper Rudnick, and retaliatory discharge, all in violation of Title VII of the Civil

Rights Act of 1964, as amended 42 U.S.C. §2000e, *et seq.* ("Title VII"); 42 U.S.C. § 1981, *et seq.*; the New York State Human Rights Law, EL §290, *et seq.* ("NYSHRL" or "Executive Law") and the Administrative Code of the City of New York; New York City Human Rights Law ("NYCHRL"), Section 8-101, *et seq.*  This Court has jurisdiction over claims arising under 42 U.S.C. §2000e, *et seq.* and 42 U.S.C. § 1981, *et seq.*

2.   Plaintiff requests this Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all of plaintiff's New York State and New York City law claims, and its claims under the Common Law of the State of New York.

3.   Plaintiff is a "person" within the meaning of 42 U.S.C. §2000e-(a); 42 U.S.C. § 1981; Executive Law §292(1); and Administrative Code §8-102(1).   At all times relevant hereto, Plaintiff resided in Westchester County, New York.

4.   Plaintiff sat for and passed the July 2001 New York State Bar Exam and was admitted to practice law in the state of New York in July 2005.  Plaintiff, an African-American woman, is a graduate of Harvard College and Harvard Law School and is a member in good standing of the New York State bar.  Plaintiff is currently engaged in the practice of corporate law in the state of New York.

5.   Defendant Piper Rudnick is an "employer" within the meaning of 42 U.S.C. §2000e-(b), 42 U.S.C. § 1981, Executive Law §292(5) and NYCHRL Section 8-102(5).  At all relevant times hereinafter mentioned, the Firm was a registered limited liability partnership engaged in the practice of law and maintaining offices for that purpose throughout the world. At all times herein relevant, Piper Rudnick maintained a principle office for the practice of law at

2

1251 Avenue of the Americas, New York, New York 10020 (the "New York Office").  The New York Office included a staff of greater than one hundred (100) attorneys.

6.    From on or about April 23, 2003 and on or about April 14, 2004, Plaintiff was employed in Piper Rudnick's New York Office.

7.    At all relevant times hereinafter mentioned, defendants Finnerty III, Finnerty Jr., Kaback, Katz, Levine, Ochis, Rappaport, and Schulman (collectively, the "NY Decision Makers") were employees of defendant Piper Rudnick at the New York Office, each of whom exercised decision making authority over Plaintiff's employment and the administration of employment policies in the New York Office.  With the exception of defendant Kaback, each of the NY Decision Makers were and are attorneys licensed to practice law in the State of New York and were, at all relevant times, duly elected members of the limited liability partnership of the Firm and, from time to time, responsible for the direct supervision of plaintiff's work on behalf of the Firm's corporate and *pro bono* clients.

8.    During the relevant period, Defendants Schulman and Finnerty Jr. were members of Piper Rudnick's Firm-wide "Executive Committee," which exercised governance authority over all policies and procedures at all of the Firm's offices.  Throughout the relevant period, Defendant Finnerty Jr. was the Head of the New York Office and Defendant Finnerty III was the Head of the Litigation Department in the New York Office.  Accordingly, Defendants Schulman, Finnerty III, and Finnerty Jr. exercised direct supervision and control over defendants Katz, Levine, Ochis, Rappaport, Pantaleo and Kaback.  Defendants Ochis, Katz and Levine were assigned to work primarily in Schulman's client group.

3

9.   Defendant Levine was, at all relevant times, one of the Hiring Partners for the Firm's New York Office.   Upon information and belief, Levine was responsible for administration of the Firm's programs and policies for associate attorney hiring, summer internships and minority recruitment.

10.   While Plaintiff was employed by the Firm, defendant Rappaport was promoted by Finnerty Jr. and Finnerty III to the position of Staffing Partner in the Litigation Department of the New York Office.   Rappaport's promotion resulted in his having direct control over assignments allocated to associate attorneys in the New York Office.

11.   At all relevant times, Defendant Fink was a partner in the Litigation Department of the New York Office. Upon information and belief, Fink provided information and instructions to the Firm's outside counsel regarding Plaintiff's application to the Appellate Division, Second Department for admission to the practice of law in the State of New York.

12.   Defendant Kaback served as the Director of Human Resources at the Firm during the entire tenure of plaintiff's employment.   Upon information and belief, Kaback's responsibilities included interpretation, dissemination, administration and supervision of the New York Office's procedures and policies with respect to hiring, complaint processing, discipline and termination as applied to all associates and legal staff.

13.   Defendant Inskeep was at all relevant times an elected partner of the Firm. Inskeep's responsibilities included oversight and administration of the Firm's programs and policies for performance review and feedback with respect to all associates, including Plaintiff.

4

## PROCEDURAL BACKGROUND

14.  On or about February 2, 2005, Plaintiff timely filed a Charge of Discrimination with the New York District Office of the Equal Employment Opportunity Commission ("EEOC") ("Charge No. 160-2005-00997").  Plaintiff alleged, *inter alia*, that the Defendants engaged in discriminatory conduct against her on the bases of race and gender, failed to remedy harassing conduct and hostile work environment, implemented and perpetuated discriminatory practices that had a disparate impact on minorities at the Firm, and reacted to Plaintiff's lawful complaints regarding disparate treatment and discriminatory practices with retaliatory dismissal from employment, all in contravention of Title VII.

15.  Plaintiff further alleged that the Defendants' retaliatory conduct continued post-termination, fueled by Plaintiff's refusal to enter into a severance agreement which included the release of her legal claims.

16.  In August 2006, the EEOC terminated its processing of Plaintiff's charge and issued Plaintiff a Notice of Right to Sue Letter (mailed August 14, 2006), a copy of which is annexed hereto and made a part of this Complaint as Exhibit A.

## GENERALLY AS TO ALL CAUSES OF ACTION

17.  On April 14, 2004, less than one year from the commencement of Plaintiff's employment at Piper Rudnick's New York Office, Finnerty Jr. and Finnerty III informed Plaintiff that her employment was terminated.

18.  The following day, defendant Kaback delivered to Plaintiff's home a proposed severance contract which included general release of claims against the Firm.  Plaintiff did not sign the proposed contract and did not release any of her claims against the Firm.

19. Plaintiff persisted in her efforts to have her claims internally addressed at the Firm by, among other things, submitting materials, through counsel, to the Firm's Executive Committee. On May 10, 2006, Plaintiff's then counsel transmitted to the Firm a letter dated May 7, 2004 (the "May 2006 Letter") detailing Plaintiff's position concerning her termination. The May 2006 Letter, a copy of which is annexed to this Complaint and incorporated herein by reference as Exhibit B, included Ms. Morisseau's detailed description of many of the facts, circumstances, events and employment practices that led to her precipitous discharge.

20. Highlighted in the May 2006 letter are the facts and circumstances surrounding three "critical developments" during Plaintiff's employ, namely, (a) Plaintiff's work with clients claiming benefits from the 9/11 Victims' Compensation Fund, under the direct supervision of Defendant Rappaport; (b) circumstances surrounding Plaintiff's February 2004 formal performance review by, among others, Defendants Levine, Finnerty III, Finnerty Jr. and Inskeep, as well as her earlier requests for feedback; and (c) Ms. Morisseau's efforts to address the Firm's hostile working conditions with Firm and its NY Decision Makers, which efforts culminated in insubordination charges communicated to her by Finnerty III, Inskeep and Kaback. Plaintiff's discharge followed less than one week later.

## Defendants' Retaliatory and Unlawful Conduct Continues Post-Termination

21. Rather than meaningfully addressing the concerns and issues raised by Ms. Morisseau and her counsel, Piper Rudnick and the New York Decision Makers persisted in efforts to coerce Plaintiff to execute a Severance Agreement and release all claims against the Defendants and the Firm.  As a retaliatory tactic, the NY Decision Makers and Pantaleo threatened that the Firm would "ruin Plaintiff's career" if she (a) pursed her request for an investigation and  (b) failed to sign a separation agreement. Pantaleo also falsely claimed that

6

the Firm was unaware that Plaintiff was not yet admitted to practice law in New York upon her hiring in April 2003 and stated that the Firm would report Plaintiff's "practice of law without a license" to the appropriate authorities. The firm reiterated the foregoing threats and conduct in retaliation for Plaintiff's having filed charges with the EEOC.

22. Additionally, Pantaleo, intentionally and maliciously interfered, in his own behalf and on behalf of the Firm's NY Decision Makers, with Plaintiff's efforts to become admitted to the Bar of the State of New York. Among other things, the Firm issued warnings and directives aimed at discouraging cooperation by the Firm's staff with the EEOC investigation.


## FIRST COUNT
### Disparate Treatment based upon Race in Violation of Title VII
### (Against Piper Rudnick)

23. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

24. Piper Rudnick violated Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-2 (m) by engaging in, perpetuating and permitting supervisory and decision making employees to engage in employment practices in which race and color were motivating factors.

25. As a result of Piper Rudnick's participation in, and failure and refusal to alleviate or remedy discriminatory practices, Plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

7

**SECOND COUNT**
**Disparate Impact on the basis of Race in Violation of Title VII**
**(Against Piper Rudnick)**

26.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

27.  Piper Rudnick violated Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-2 (m) by implementing, perpetuating and permitting supervisory and decision making employees to engage in policies, practices, and procedures that had a disparate impact on African-American employees.

28.  As a result of Piper Rudnick's participation in, and failure and refusal to alleviate or remedy discriminatory practices, Plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

**THIRD COUNT**
**Discrimination based upon Race in Violation of 42 U.S.C. § 1981**
**(Against Piper Rudnick, Finnerty Jr., Finnerty III, Inskeep, Katz, Levine, Ochis,**
**Rappaport and Schulman)**

29.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

30.  Defendants' (1) disparate treatment of Plaintiff during the term of her employment, in performance scoring and ranking, staffing, billable hours expectations, and articulated disciplinary assessment; and (2) hiring, performance scoring, and staffing practices yielding a disparate impact, violated rights that are themselves protected by 42 U.S.C. § 1981.

8

31. Defendant's conduct has caused Plaintiff to suffer loss of pay, contractual and property interests, and benefits. Defendant's conduct caused Plaintiff emotional distress, with malice and reckless indifference to Plaintiff's federally protected rights.

## FOURTH COUNT
### Discrimination based upon Race in Violation NYSHRL
### (Against Piper Rudnick, Rappaport, Levine, Ochis and Katz)

32. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

33. Piper Rudnick, Rappaport, Levine, Ochis and Katz, and each of them, violated Executive Law §296(1) by engaging in, perpetuating and permitting their employees to engage in discriminatory employment practices based upon race and color.

34. As a result of these defendants' failure to alleviate or remedy the discriminatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

## FIFTH COUNT
### Discrimination based upon Race in Violation NYCHRL
### (Against Piper Rudnick)

35. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

36. Piper Rudnick violated New York City Administrative Code §8-107(1)(a) by engaging in, perpetuating and permitting their employees to engage in discriminatory employment practices based upon race and color.

37. As a result of Defendant Piper Rudnick's failure to alleviate or remedy the

discriminatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

**SIXTH COUNT**
**Hostile Work Environment In Violation of Title VII**
**(Against Piper Rudnick)**

38.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

39.  Piper Rudnick violated Title VII, 42 U.S.C. §2000e, *et seq.,* by creating a hostile work environment in that Piper Rudnick engaged in, perpetuated and permitted those in supervisory and decision making positions to engage in harassing behavior against the plaintiff, with complete knowledge of such unlawful behavior.

40.  As a result of Piper Rudnick's failure to alleviate or remedy the harassing conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

**SEVENTH COUNT**
**Hostile Work Environment In Violation of  NYSHRL**
**(Against Piper Rudnick, Ochis, Rappaport, Levine and Katz)**

41.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

42. Piper Rudnick, Ochis, Rappaport, Levine and Katz, and each of them, violated Executive Law §296(1), by creating a hostile work environment in that Piper Rudnick engaged in, perpetuated and permitted its supervisors and decision makers to engage in harassing

10

behavior against the plaintiff, with complete knowledge of such unlawful behavior.

43.  As a result of these defendants' failure to alleviate or remedy the harassing conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

## EIGHTH COUNT
### Hostile Work Environment In Violation of NYCHRL
### (Against Piper Rudnick)

44.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

45.  Piper Rudnick violated New York City Administrative Code §8-107(1)(a), by creating a hostile work environment in that the firm engaged in, perpetuated and permitted its decision makers to engage in harassing behavior against the plaintiff, with complete knowledge of such unlawful behavior.

46.  As a result of Piper Rudnick's failure to alleviate or remedy the harassing conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

## NINTH COUNT
### Retaliatory Disciplinary Proceedings and Discharge in Violation of Title VII
### (Against Piper Rudnick)

47.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

48.  Piper Rudnick violated Title VII, 42 U.S.C. §2000e-3,  by discriminating against

11

Plaintiff by reason of her having opposed, complained and otherwise having engaged in protected activities with respect to alleged unlawful employment practices engaged in by the Defendants in violation Title VII, the NYSHRL and the NYCHRL.

49. As a result of Piper Rudnick's retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

## TENTH COUNT
### Retaliatory Disciplinary Proceedings and Discharge in Violation of 42 U.S.C. § 1981 (Against All Defendants)

50. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

51. The Defendants and each of them engaged in acts of retaliation against Plainitff for opposing discriminatory practices while employed at the Firm and for attempting to enforce rights that are themselves protected by Title VII.

52. As a result of Piper Rudnick's retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

53. Defendants' conduct has caused Plaintiff to suffer loss of pay, contractual and property interests, and benefits. Defendant's conduct caused Plaintiff emotional distress, with malice and reckless indifference to Plaintiff's federally protected rights.

## ELEVENTH COUNT
### Post-Termination Retaliation in Violation of Title VII
### (Against Piper Rudnick)

54.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

55.  Piper Rudnick violated Title VII, 42 U.S.C. §2000e, *et seq.,* by threatening reprisals against Plaintiff's bar admissions proceedings and unduly interfering with such proceedings, to Plaintiff's substantial detriment, including the denial of access to witnesses for an administrative hearing.

56.  Accordingly, Defendant retaliated against Plaintiff for opposing discriminatory practices, for participating in protected activity and for attempting to enforce her rights under Title VII. As a result of Piper Rudnick's intentional and reckless retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress, loss of enjoyment of life and reputational interests; and has incurred, and will incur damages thereby.

57.  Defendants' conduct has caused Plaintiff to suffer loss of pay, contractual and property interests, and benefits.  Defendant's conduct caused Plaintiff emotional distress, with malice and reckless indifference to Plaintiff's federally protected rights.

## TWELFTH COUNT
### Post-Termination Retaliation in Violation of 42 U.S.C. § 1981
### (Against All Defendants)

58.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

59.  The Defendants and each of them engaged in acts of retaliation against Plaintiff for

opposing discriminatory practices while employed at the Firm and for attempting to enforce rights that are themselves protected by Title VII.

60.  As a result of Defendants' retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

61.  Defendants' conduct has caused Plaintiff to suffer loss of pay, contractual and property interests, and benefits.  Defendant's conduct caused Plaintiff emotional distress, with malice and reckless indifference to Plaintiff's federally protected rights.

### THIRTEENTH COUNT
#### Retaliation in Violation of NYSHRL
#### (Against All Defendants)

62.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

63.  The Defendants and each of them violated Executive Law §296(1) by discriminating against Plaintiff by reason of her having opposed, complained and otherwise having engaged in protected activities with respect to alleged unlawful employment practices engaged in by the Defendants in violation of Title VII, the NYSHRL and the NYCHRL.

64.  As a result of defendants' retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

14

## FOURTEENTH COUNT
### Retaliation in Violation of NYCHRL
### (Against Piper Rudnick)

65.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

66.  Piper Rudnick violated New York City Administrative Code §8-107(1)(a) by discriminating against Plaintiff by reason of her having opposed, complained about and otherwise engaged in protected activities with respect to alleged unlawful employment practices engaged in by the Defendants in violation of Title VII, the NYSHRL and the NYCHRL.

67.  As a result of defendants' retaliatory conduct, plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

### FIFTEENTH COUNT
### Breach of Contract
### (Against Piper Rudnick)

68.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22, inclusive, of this Complaint as if fully set forth at length herein.

69.  Ms. Morisseau's employment by Piper Rudnick included the mutual obligations to comply with the requirements of the Code of Professional Responsibility, 22 NYCRR §1200 *et seq.* Including the behavioral and practice obligations imposed on attorneys by reason of DR 1-102 and the reporting obligations imposed on attorneys by reason of DR 1-103.

70.  Piper Rudnick breached its contract of employment with Plaintiff by disciplining

15

Plaintiff and terminating Plaintiff's employment as a result of Plaintiff having engaged in activities required of her pursuant to DR 1-102 and DR 103 of the Code of Professional Responsibility.

71. Plaintiff fully performed all conditions and obligations on her part under and pursuant to her contract of employment with Piper Rudnick.

72. As a result of the foregoing Breach of Contract, Plaintiff has lost, and will lose wages and benefits that she would have obtained from said position; and has suffered, and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred, and will incur damages thereby.

WHEREFORE, Plaintiff prays that Judgment be awarded in her favor and against the Defendants, as follows:

(A)     Awarding Plaintiff compensatory damages as against Defendant Piper Rudnick on the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth Counts in the aggregate sum of Thirty Million ($30,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(B)     Awarding Plaintiff compensatory damages as against Defendant Levine on the Fourth, Seventh, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Ten Million ($10,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(C)     Awarding Plaintiff compensatory damages as against Defendant Rappaport on the Third, Fourth, Seventh, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Twelve

16

Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(D)    Awarding Plaintiff compensatory damages as against Defendant Katz on the Third, Fourth, Seventh, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(E)    Awarding Plaintiff compensatory damages as against Defendant Ochis on the Third, Fourth, Seventh, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(F)    Awarding Plaintiff compensatory damages as against Defendant Kaback on the Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Six Million ($6,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(G)    Awarding Plaintiff compensatory damages as against Defendant Finnerty III on the Third, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(H)    Awarding Plaintiff compensatory damages as against Defendant Finnerty Jr. on the Third, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

17

(I)     Awarding Plaintiff compensatory damages as against Defendant Inskeep on the Third, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(J)     Awarding Plaintiff compensatory damages as against Defendant Schulman on the Third, Tenth, Twelfth and Thirteenth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(K)     Awarding Plaintiff punitive damages as against Defendant Piper Rudnick on the First, Second, Third, Sixth, Ninth, Tenth, Eleventh and Twelfth Counts in the aggregate sum of Thirty-Two Million ($32,000,000.00), or in such greater amount as is determined following trial.

(L)     Awarding Plaintiff punitive damages as against Defendant Levine on the Tenth and Twelfth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(M)     Awarding Plaintiff punitive damages as against Defendant Rappaport on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(N)     Awarding Plaintiff punitive damages as against Defendant Katz on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or

in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(O)     Awarding Plaintiff punitive damages as against Defendant Ochis on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(P)     Awarding Plaintiff punitive damages as against Defendant Finnerty III on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(Q)     Awarding Plaintiff Punitive damages as against Defendant Finnerty Jr. on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(R)     Awarding Plaintiff punitive damages as against Defendant Inskeep on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(S)     Awarding Plaintiff punitive damages as against Defendant Schulman on the Third, Tenth and Twelfth Counts in the aggregate sum of Twelve Million ($12,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(T)    Awarding Plaintiff punitive damages as against Defendant Kaback on the Tenth and Twelfth Counts in the aggregate sum of Eight Million ($8,000,000.00) Dollars, or in such greater amount as shall be determined to fully and adequately compensate Plaintiff for her injuries.

(U)    Awarding Plaintiff her attorneys' fees and costs and disbursements associated with the pursuit of these claims.

Dated:  New York, New York
       November 15, 2006

                             BALLON STOLL BADER & NADLER, PC
                             Attorneys for Plaintiff

                             By:_____
                                  Marshall B. Bellovin (MBB )

                             1450 Broadway
                             New York, New York  10018
                             212-575-7900

# EXHIBIT A

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: **Charlene Morisseau**
    **170 Grand Street, Apt. 4A**
    **White Plains, NY 10601**

From:  **New York District Office**
      **33 Whitehall Street**
      **5th Floor**
      **New York, NY 10004**

[ ]   *On behalf of person(s) aggrieved whose identity is*
     *CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **160-2005- 00997** | **Chris Kwok,**<br>**Federal Investigator** | **(212) 336-3762** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ]   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]   While reasonable efforts were made to locate you, we were not able to do so.

[ ]   You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X]   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]   Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosure(s)

_____
**Spencer H. Lewis, Jr.,**
**Director**

*8/14/06*
*(Date Mailed)*

cc: **Ballon Stoll Bader & Nadler**
    **1450 Broadway**
    **New York, NY 10018**

    **Attn: Marshall Belovin**

**Proskauer Rose**
**1585 Broadway**
**New York, NY 10036**

**Attn: Bettina Plevan**

Enclosure(s)

cc:  **DLA Piper Rudnick**
    **1251 Avenue of Americas**
    **New York, NY 10020**

    **Attn: Human Resources**

# FACTS ABOUT FILING
## AN EMPLOYMENT DISCRIMINATION SUIT
## IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a private lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. New York State has four federal districts:

- The **United States District Court for the Southern District of New York** is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester.

- The **United States District Court for the Eastern District of New York** is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk.

- The **United States District Court for the Western District of New York** is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates.

- The **United States District Court for the Northern District of New York** is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneinda, Onandaga, Oswego, Otsego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's *pro Se* Attorney has offices at 10 Broad Street in Utica New York.

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit **must** be filed in U.S. District Court within **90 days** of the date you receive the enclosed final action. Once this 90 day period is over, unless you have filed suit, you will have lost your right to sue.

(Over)

Information Sheet (page 1 of 2)

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit. You may file a complaint in federal court without a lawyer which is called a *pro se* complaint. Every district court has either a clerk or staff attorney who can assist you in filing *pro se*. To find out how to file a *pro se* complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may vary from district to district.

You may, however, wish to retain a lawyer in order to adequately protect your legal rights. Whether you retain a private attorney, or file *pro se*, you must file your suit in the appropriate court within 90 days of receiving this mailing.

## WHAT IF I WANT A LAWYER BUT I CAN'T AFFORD ONE?

If you can't afford a lawyer, the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer. You must file papers with the court requesting the appointment of counsel. You should consult with the office of the district court that assists *pro se* complainants for specific instructions on how to seek counsel. The appointment of counsel in any *pro se* complaint is always at the discretion of the court.

Generally, the U.S. District Court charges a $250.00 filing fee to commence a lawsuit. However, the court may waive the filing fee if you cannot afford to pay it. You should ask the office of the District Court that assists *pro se* complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may be of assistance to you in finding a lawyer to assist you in ascertaining and asserting your legal rights:

American Bar Association                     New York State Bar Association
(312) 988-5522                               (800) 342-3661

National Employment Lawyers Association Referral Service
(212) 819-9450

Your County, City, or Municipal Lawyers or Bar Association may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge file to be destroyed after 2 years from the date of a no cause determination or six months after other types of final actions. If you file suit, and wish us to retain your file for more than the normal retention period, you or your attorney should forward a copy of your court complaint to this office within 10 days after you file suit. **If You File Suit, You or Your Attorney Should Also Notify this Office When the Lawsuit is Resolved.**

Information Sheet (page 2 of 2)

**EXHIBIT B**

Facsimile Cover Sheet
**REID RODRIGUEZ & ROUSE, LLP**
**1285 AVENUE OF THE AMERICAS**
**SUITE 3513**
**NEW YORK, NEW YORK 10019**
**(TEL. 212-554-4410)**
**(FAX. 212-554-4089)**

Date:   May 10, 2004

To: Roxanne Sokolove Marenberg, Esq..

Fax:    (202) 223-2085

From:   Gregory Reid, Esq.

Re:   <u>Charlene Morisseau's Severance from Piper Rudnick</u>

Pages, including cover, 14.

Please see the attached.

The information contained in this facsimile transmission is confidential and/or legally privileged information from the law firm of Reid Rodriguez & Rouse, LLP.  It is intended only for the use of the individual (s) named on the transmission sheet.  If you are not the intended recipient (s), you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance upon the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please notify our office at the above telephone number immediately so we can arrange for the return of the document to us at no cost to you.

**REID RODRIGUEZ & ROUSE, LLP**

1285 AVENUE OF THE AMERICAS
SUITE 3513
NEW YORK, NEW YORK 10019
TELEPHONE (212) 554-4417
FACSIMILE (212) 554-4089

May 7, 2004

**VIA FACSIMILE**
Roxanne Sokolove Marenberg, Esq.
Piper Rudnick, LLP.
1200 Nineteenth Street, N.W. 20036-2412
Washington, D.C. 20036-2412

Re: <u>Charlene Morisseau's Severance from Piper Rudnick</u>

Dear Ms. Marenberg:

    This letter is in further regard to Ms. Morisseau's ▮▮▮▮▮, 2004 separation from Piper Rudnick. Ms. Morisseau, a 1995 graduate of Harvard College (cum laude degree) and a 2001 graduate of the Harvard Law School, where she was an Editor of the Harvard Law Review, was particularly concerned by the abruptness and, in her opinion, potentially illegal circumstances of her forced separation from your firm. Piper Rudnick's decision followed (i) Ms. Morisseau's selection by the NY office's Hiring Committee as one of the associates to interview prospective summer interns, (ii) Ms. Morisseau's very favorable 2003 performance evaluation, raise and performance bonus, (iii) Ms. Morisseau's receiving strong verbal and written feedback from Piper Rudnick clients and partners, including, but not limited to, Joseph Finnerty III and Heidi Levine during the first quarter of 2004; (iv) Ms. Morisseau's selection by Piper Rudnick's Chicago office to represent the firm at the Harvard Law School's Black Law Student Association's Spring Conference in March of 2004; and (v) senior partner Amy Schulman's referral of Ms. Morisseau to the International Association for Women Judges as a member of its Board of Trustees, which includes attorneys, judges, and legal professors nationwide. Indeed, merely two weeks before Ms. Morisseau's termination, Heidi Levine commented on multiple, separate occasions that Ms. Morisseau made her feel "comfortable," and that Ms. Levine felt "relieved" because she could simply give Ms. Morisseau an assignment and "did not have to worry about it anymore." As of early April 2004, the only remote criticism that Ms. Levine indicated was that Ms. Morisseau was "too nice" in her communications with opposing counsel. Finally, Ms. Morisseau enjoyed the respect of her peers, staff and her teammates.

    Moreover, we are given to understand that at the time of her termination, Ms. Morisseau was the only African-American attorney out of nearly 200 attorneys employed in the New York City office of Piper Rudnick. Given the significant presence of qualified African-American attorneys in New York City, this measurable underutilization of African-Americans attorneys in Piper Rudnick's New York office on its face raises troubling questions regarding Piper Rudnick's management of diversity, disparate impact policies, and commitment to and compliance with the affirmative action obligations of Executive Order 11246, as a context for the particularized disparate treatment concerns of

Roxanne Sokolove Marenberg, Esq.                              May 7, 2004
Page Two

the instant case. For example, although Piper Rudnick has instituted the position of a firmwide Diversity Coordinator, the position has had an inexplicably high turnover rate, currently remaining open since the first quarter of 2004, a period during which Ms. Morisseau was searching for someone trustworthy to communicate race related concerns. We are further given to understand that Piper Rudnick's New York office terminated Ms. Morisseau's immediate predecessor, who is also an African-American woman, and that Piper Rudnick has a recent history of claims brought by African-American attorneys concerning the fairness of their treatment and discharges.

In sum, Piper Rudnick recruited and hired a highly qualified and credentialed associate, who happens to be African-American, acknowledged her strong performance in her official evaluations, gave her feedback evincing distinctive performance, recommended Ms. Morisseau for prestigious and responsible assignments and then abruptly terminated her, without warning, notice, or discernible objective reasons. The question then is what, if any, specific triggers can be identified that provide plausible explanations for Piper Rudnick's sudden decision that Ms. Morisseau had to depart from the firm and whether such triggers or explanations implicate legal claims cognizable under the applicable law. For the following reasons, we believe they do.

New York courts have accorded employers a broad right to terminate the employment of at will employees, with the important exceptions of (i) employee terminations based on statutorily prescribed bases under the local, state, and federal laws prohibiting unlawful discrimination due to specified immutable characteristics, [1] (ii) retaliatory termination for protected activity by an employee under the statutes referred to in (i) above, and (iii) termination of attorneys under circumstances that give rise to a cause of action permitted by the New York Court of Appeals in Wieder v. Skala , 80 N.Y.2d 628 (1992). Furthermore, although discharge of an employee is by itself insufficient for a cause of action for defamation, disparagement of an employee's work quality or her fitness for a job is actionable per se, without a showing of special damages. Evaluations of employees made by their superiors enjoy a qualified privilege in defamation actions. Shamley v. ITT Corp., 869 F.2d 167, 173 (2d Cir. 1989) (applying New York law). Still, a plaintiff may overcome this qualified privilege with evidentiary proof that the defendant was motivated by "actual malice,...ill-will,...personal spite,...or culpable recklessness or negligence." See, e.g., Tischman v. ITT/Sheraton Corp., 882 F. Supp. 1358 (S.D.N.Y. 1995). Thus, despite Piper Rudnick's New York City office's repeated reiteration to Ms. Morisseau during her last two meetings with the firm that she was merely an at will employee, Piper Rudnick's decision to terminate Ms. Morisseau nevertheless poses serious legal questions.

---

[1] Attorneys are also prohibited from discrimination by the rules of professional conduct. Although there is no direct civil liability for the alleged discriminator under the rules of professional conduct, a putative discriminatee obviously can file a complaint alleging discrimination against a law firm for discriminatory employment practices and the subsequent investigation of the complaint may result in appropriate disciplinary penalty if the complaint is found to be true by the disciplinary committee.

May 7, 2004

Roxanne Sokolove Marenberg, Esq.
Page Three

A review of the salient aspects of Ms. Morisseau's brief employment history with Piper Rudnick indicates three critical developments that apparently sealed her fate with the firm. The first involved her work on the 9/11 Victims Compensation Fund ("VCF") during the middle of December 2003. Specifically, on one VCF case Ms. Morisseau had informed the supervising partner that certain income tax return documents appeared incorrect. After Ms. Morisseau discussed the matter with a Piper Rudnick tax attorney, who concurred with her assessment that the accounting was faulty, Ms. Morisseau sought verification of the reported income with the decedent's spouse, who could not identify the source of the reported income. In subsequent discussions with investigators from Piper Rudnick's ▓▓▓▓▓ office, where the accountant who filed the income tax documents resides, the investigators informed Ms. Morisseau that the accountant appeared to be unstable when approached, threatened violence and alleged to be associated with organized crime. Ms. Morisseau continuously reported all developments to the supervising partner, who then independently contacted the accountant. Afterwards the partner told Ms. Morisseau that the accountant was uncooperative and seemed "crazy." Stating that he knew Ms. Morisseau had counseled against the use of the figures, the partner nevertheless instructed Ms. Morisseau to use the income figures in preparing the claim to the federal government. The partner expressly stated that there was an "obligation" to "make the numbers as high as possible." After receiving the draft application for the claim, the client objected to the use of the numbers and expressed concern that misrepresentations to the 9/11 Fund would be "illegal." During a subsequent telephone conversation involving the client, a relative of the client who had financial expertise, the supervising partner at Piper, and Ms. Morisseau, the partner agreed to the client's demands not to use the questionable income figures and then at the end of the meeting, surprisingly, stated to the client that, "Charlene is doing the best she can" but that mistakes would happen. The clear implication was that Ms. Morisseau was responsible for the use of the faulty income figures. Subsequently, the partner repeated this conduct whenever clients questioned Piper's judgement on the federal filings.

During the week of December 2003, Ms. Morisseau addressed the partner's conduct towards her with another Piper Rudnick partner, Heidi Levine, who was Ms. Morisseau's self-appointed informal "mentor." Ms. Levine informed Ms. Morisseau that the partner was "known" for that type of behavior, that the partner "just doesn't get it," and that, specifically, the partner had "trouble working with female" junior associates. In point of fact, Ms. Levine informed Ms. Morisseau that another senior associate, Robin Tarr, had just recently had to caution the same partner about interactions with a female junior associate. This was the second time Ms. Levine had expressed such sentiments to Ms. Morisseau about this partner. When Ms. Morisseau first started at the firm, Ms. Levine had told Ms. Morisseau that this partner had "problems working with women," such as alleged altercations he had with a Piper

Roxanne Sokolove Marenberg, Esq.                    May 7, 2004
Page Four

Rudnick partner, Marilla Ochis, when she was an associate, and that Ms. Morisseau should "watch out" when working with him.

As she had discussed with Ms. Levine, Ms. Morisseau proceeded to speak to the 9/11 supervising partner about his conduct on the same day. The partner acknowledged that the conduct had been inappropriate, that he "ran his practice" by encouraging associates to be direct with him, that she should see how the other associates challenge him, and that she was "standing up for herself well." The partner then began cautioning Ms. Morisseau that she should be a "team player." Upon returning to her office, Ms. Morisseau completed her work on the case. Ms. Levine came to Ms. Morisseau's office and inquired how the discussion had proceeded. Ms. Morisseau reviewed the discussion with her and Ms. Levine assured Ms. Morisseau that she seemed to have handled the situation well. Ms. Morisseau left for vacation that same day.

When Ms. Morisseau returned to work from her vacation in January 2004, the supervising partner on the 9/11 cases began making <u>Hopkins v. Price Waterhouse</u> type comments to other supervisors and co-workers about her in the hallway and in other partners' offices within earshot of Ms. Morisseau, e.g, that she was "too aggressive," "ha[d] a bad attitude," was "not right for a law firm," "she does very good work, but there's something not right about her," and other disparaging and coded comments. The partner's assertions that Ms. Morisseau was too aggressive were directly opposite to what the partner had said before. Indeed, just prior to this time, the partner had made comments in front of VCF clients that Ms. Morisseau needed to "be more aggressive" and that she was too "nice." The January 2004 written reviews from this same partner identified her as a strong team player and as having a positive work attitude. There is no question that because of Piper's culture and stated policy against "aggressive" behavior that the partner clearly understood that the comments would have a serious adverse impact on Ms. Morisseau's career at Piper Rudnick.

Second, during this time Ms. Morisseau had a separate concern about her performance reviews. At Piper Rudnick she had written extensively and independently, and partners had sent her written work product directly to clients without edits. The clients had responded very positively to the work. On at least one occasion, a senior partner had sent Ms. Morisseau a written correspondence that her writing was very strong and "better than a competitor's" who had sent the client a memorandum on the same topic. Such feedback was unsolicited. However, on her performance reviews, Ms. Morisseau received only average scores for her written work product.

May 7, 2004

Roxanne Sokolove Marenberg, Esq.
Page Five

Ms. Morisseau sought feedback from one of her supervising attorneys regarding how she could improve her writing skills, a most important aspect of her professional development. Although feedback meetings are supposedly encouraged by the firm, in her meeting with one partner, Ms. Morisseau was met with inexplicable opposition. The partner repeatedly questioned her motives for inquiring into the scoring system. While Ms. Morisseau repeatedly assured the partner that she only sought feedback to improve her writing, the partner told her that feedback was not possible because the evaluations were "subjective," gave her substantive feedback that was clearly erroneous, and acknowledged that no other junior associate had executed a higher quality of work than Ms. Morisseau. At her request for a writing sample to provide her with more concrete guidance, the partner provided a memorandum that was completed by a senior associate and partners, but which was nonetheless similar to Ms. Morisseau's own work. The partner's demeanor at the meeting, inability to provide feedback related to the work, and model of comparable work provided convinced Ms. Morisseau that she had not been given proper credit for her written work. Ms. Morisseau was also aware that many minority associates at Piper Rudnick shared the sentiment that, despite the fact that their credentials often exceeded those of their non-minority peers at the firm, minority associates were consistently denied credit for their skill based work regardless of the quality of their work product. Ms. Morisseau sent a message to Ms. Levine that Ms. Morisseau believed that she had a basis for questioning the reviews for her written work.

In February 2004, Ms. Morisseau attended a formal performance review with partners from the NY office, including Heidi Levine, Joseph Finnerty III, Joseph Finnerty, Jr. (head of the NY office), and partners from the firm's Chicago office, Leroy Inskeep and Bob Mathias. Karen Litscher Johnson, the firmwide Director of Professional Development, also participated via teleconference. Despite Ms. Morisseau's request to attend the meeting without the presence of the NY partnership, Ms. Levine insisted on attending and advised Ms. Morisseau that the leadership of the New York office would also be present. Among the issues discussed at the meeting were the New York office's lack of racial diversity and whether Ms. Morisseau could follow up with partners for feedback about her written reviews. The partners responded positively and then advised Ms. Morisseau that she should be "proactive in managing her career."

Following that meeting, Ms. Levine came to Ms. Morisseau's office and told her that she had "handled herself well" when raising her concerns, that she had "remained positive" about her experiences and her commitment to the firm, and had demonstrated an understanding that "some issues are better handled in the NY office" rather than raising them with the Chicago office partners, who represented the leadership of the firm. Around this same time, Ms. Morisseau received a correspondence from Joseph Finnerty III that he enjoyed working with her. Ms. Morisseau had separately contacted

Roxanne Sokolove Marenberg, Esq.                    May 7, 2004
Page Six


Leroy Inskeep, but based on the comments and actions of Ms. Levine and the New York management, decided to keep her concerns within the New York office.

Subsequently, Ms. Morisseau overheard the partner from whom she had sought feedback discussing her inquiry and the details of her performance evaluations in the hallway outside her office with yet another partner and another junior associate. The partner had also apparently discussed the meeting with the 9/11 partner, with the two of them disparaging Ms. Morisseau within earshot of her office on multiple occasions. The most troubling comments made were by the 9/11 supervising attorney, who stated, "she's not right for a law firm....you know what that means...that's code." The same partner, who was responsible for providing assignments to associates, did not respond to Ms. Morisseau's e-mails regarding assignments, but would question her time allocation. Although Ms. Morisseau worked with the partner less than ten hours per month, the partner continued to contact Ms. Morisseau's direct supervising attorneys to complain about her.

Third, on or about March 22, 2004, Ms. Morisseau met with Sarah Cannaday, a Piper Rudnick human resource professional, to discuss what Ms. Morisseau viewed as a hostile working environment. Ms. Cannaday expressed concern about Ms. Morisseau's reported experiences, particularly since Mr. Finnerty III had delegated to the partner in charge of the 9/11 cases not only the assigning process, but also responsibilities to be "even more involved" in the individual "professional development" of all associates in the New York Litigation Department. Ms. Cannaday expressly told Ms. Morisseau that, in light of the circumstances, the situation required intervention. Thus, Ms. Cannaday agreed to speak to the partner in charge of the 9/11 cases about Ms. Morisseau's concerns.

In a follow up meeting by Ms. Morisseau with Sarah Cannaday on or about March 29, 2004, Ms. Cannaday reported that she had met with the partner, who had acknowledged the inappropriate behavior and agreed to desist. Ms. Cannaday asked if this resolved Ms. Morisseau's concerns. Ms. Morisseau expressed concern that by this point the offensive conduct had extended beyond that one partner and asked whether the other partner could be approached as well. Ms. Cannaday agreed, commenting that she believed that there had been an inordinate amount of scrutiny of Ms. Morisseau that was disproportionate to her junior status. When asked about the other partner's actions, Ms. Morisseau discussed her performance evaluation with Ms. Cannaday and Ms. Morisseau's growing concerns that the New York partners of Piper Rudnick were unlawfully holding African-American attorneys to a separate and higher performance standard, violative of Title VII of the Civil Rights Act of 1964. Ms. Cannaday asked if she could "elevate" the issues discussed to parties within the New York office and Ms.

May 7, 2004

Roxanne Sokolove Marenberg, Esq.
Page Seven

Morisseau agreed, on the condition that she was informed as to whom Ms. Cannaday contacted. It is my opinion that this conversation by Ms. Morisseau with Ms. Cannaday constituted protected activity within the meaning of section 2000e-3(a) of Title VII of the Civil Rights Act of 1964 and under the New York Human Rights Law, N.Y. Exec. Law section 290.

Either later in the same day or on the following day, Ms. Morisseau met with Ms. Levine ostensibly to discuss charts on a client case and work allocation issues. Also present during this discussion was Natalie Zaidman, a senior associate from Piper Rudnick's Baltimore office. Ms. Zaidman was one of Ms. Morisseau's supervising attorneys and directly influenced Ms. Morisseau's performance reviews. After the team reviewed the client charts, Ms. Levine stated that she wanted to address Ms. Morisseau's work allocation issues. She suddenly began hurling accusations at Ms. Morisseau, including assertions that Ms. Morisseau was "not right for a law firm," that "everything was always about [Ms. Morisseau]," and that Ms. Morisseau was "always trying to get off of cases," and "had issues all the time." Ms. Levine stated that she believed that Ms. Morisseau was trying to "create a paper trail" and that she "knew what [Ms. Morisseau] was trying to do." Ms. Levine said she felt "upset" and betrayed. Ms. Morisseau attempted to end the meeting constructively. Afterwards, she was completely stunned and taken aback by the comments of Ms. Levine, with whom she had a positive relationship. Equally surprising was the fact that such a confidential discussion occurred in front of another Piper Rudnick associate. Ms. Morisseau was immediately concerned that Ms. Cannaday had reported their discussions to Ms. Levine, particularly given what Ms. Morisseau believed to be the coded reference to her "not being right for a law firm."

On the following day, Ms. Morisseau informed Denise Kaback, of Piper Rudnick's Human Resources Department, about Ms. Levine's comments and asked whether Ms. Morisseau's job was in jeopardy. Ms. Kaback replied that "performance standards [had] to be met" and scheduled a meeting for the following day. However, on the next morning, Ms. Kaback cancelled the meeting and told Ms. Morisseau that Ms. Kaback would be out of the office for several days. Ms. Cannaday simultaneously became unavailable, allegedly due to bereavement leave. Ms. Morisseau contacted personnel in Ms. Kaback's office and was informed that only Ms. Kaback could address her concerns and that she would have to await Ms. Kaback's return. Ms. Kaback never responded to Ms. Morisseau. The hostile comments about Ms. Morisseau by certain Piper Rudnick partners in the hallway did not abate. For example, the 9/11 supervisor stated on one occasion that "this firing is taking so long the release will be like an orgasm."

On or about April 1, 2004, Ms. Morisseau scheduled an April 8th meeting with the head of the litigation department, Joseph Finnerty III. Unexpectedly at the meeting, Denise Kaback and Leroy Inskeep (Chicago office) were also present. Ms. Morisseau was informed that she was formally being charged with "insubordination."

Roxanne Sokolove Marenberg, Esq.                    May 7, 2004
Page Eight

Mr. Finnerty III further stated that the firm had conducted a full "investigation" and that there was a "consensus" that her substantive performance was strong but that her conduct was deficient, especially her comments to Ms. Levine about the 9/11 cases supervising partner Additionally, Mr. Finnerty III told her that such conduct was a dischargeable offense.  Ms. Morisseau explained the basis for her concerns about the handling of the 9/11 VCF cases.  Mr. Finnerty III dismissed her concerns and stated that she had acted insubordinately.  Ms. Morisseau expressed confusion, stating that she had not inappropriately questioned the partner's judgment.  Furthermore, Ms. Morisseau observed that her performance reviews, including reviews from the partner in question, had rated her as excellent on the same criteria for which she was now being called deficient, and that she had received positive verbal feedback from Mr. Finnerty Jr. and from Ms. Levine as recently as two weeks prior.

Mr. Finnerty III responded that Ms. Morisseau's understanding of the underlying facts was not relevant. Contrary to her views of her performance, he added, none of the contributors to the "investigation" had any positive feedback at all on Ms. Morisseau's professionalism. Notwithstanding her written reviews, Mr. Finnerty III asserted, it took "only one incident" for Ms. Morisseau's to face termination. He declared that he would not comply with Ms. Morisseau's request to investigate the conduct of the partners because he would "take the word of [his] partners" over that of a "junior associate who had been at the firm for less than a year." Mr. Inskeep added that "where there's smoke there's fire" and that "the first thing an alcoholic has to do is to admit that they have a problem." Denying Ms. Morisseau any further opportunity to answer the charges or to raise her prior complaints, Piper Rudnick's management then told her that she was subject to an at will employment relationship and that she could either choose "Plan A," which was an "opportunity" to "correct" her "insubordinate" behavior, or choose "Plan B," which would be to discuss "severance options." Mr. Finnerty III scheduled to meet with her on the morning of April 13th to get "her decision."

On April 12, 2004, Ms. Morisseau contacted Ms. Kaback with regard to the planned meeting to see the written findings from the internal investigation alluded to during the meeting on April 8th.  At first Ms. Kaback stated that the word "investigation" had never been used.  She then conceded that, in fact, there had been no "investigation." Instead, Ms. Kaback asserted, a "couple of partners had complained to [Mr. Finnerty III]" and that was why "[Mr. Finnerty III] had called you into his office." Ms. Morisseau informed Ms. Kaback that, in fact, Ms. Morisseau had been the one to contact Mr. Finnerty III to follow up on her complaints to Ms. Cannaday and to determine whether she was being subject to retaliation. Ms. Morisseau also stated that she believed that the April 8th discussion was to deliver the results of an internal investigation of her complaints to Ms. Cannaday. After Ms. Kaback alleged that she "did not know" Ms. Morisseau had made any complaint to Ms. Cannaday, Ms. Morisseau asked to come to

May 7, 2004

Roxanne Sokolove Marenberg, Esq.
Page Nine

Ms. Kaback's office to relay the reports she made to Ms. Cannaday. However, Ms. Kaback refused, stating that she had to leave the office for a doctor's appointment but that she would check with her boss in Baltimore to determine the appropriate procedure and get back to Ms. Morisseau.

Since Ms. Kaback never followed up with Ms. Morisseau, later that evening she telephoned Mr. Finnerty III to ask for a postponement of their meeting. During their conversation Mr. Finnerty III acknowledged that he had indeed used the word "investigation," but asserted that he had only meant "to let [Ms. Morisseau] know the level of seriousness to which this [situation] had risen," not to mean that there had been a formal inquiry. Mr. Finnerty III insisted that it was only a coincidence that Ms. Morisseau had lodged complaints with Ms. Cannaday just prior to the charge of insubordination against her. Ms. Morisseau again requested to postpone the meeting until after Ms. Cannaday returned to the office and her complaints could be properly investigated. Mr. Finnerty III refused.

On April 13, 2004, Ms. Morisseau met with Ms. Kaback and Mr. Finnerty III, who repeatedly attempted to persuade Ms. Morisseau to resign. She denied the charge of insubordination, raised facts that belied the charge, and again asked for Mr. Finnerty Jr. or other firm personnel to gather relevant facts from the partners implicated, specifically regarding whether she was being subject to retaliation. Mr. Finnerty Jr. refused her request. Ms. Morisseau asked whether Mr. Finnerty Jr. could give her any constructive criticism on what conduct she should remedy with regards to "Plan A." Instead, he responded that her questions indicated an unwillingness to choose "Plan A" and that his belief about her was based on reports of misconduct over time, not just any one incident as he had previously alleged. Mr. Finnerty III kept inviting her to choose "Plan B." Ms. Morisseau refused to resign and asked for a fair investigation into her complaints and an inquiry into whether a causal connection existed between her complaints and the charge of insubordination. Finally, after Mr. Finnerty Jr. stated that the firm would "get back" to Ms. Morisseau with a "response", Mr. Finnerty III ended the meeting.

On April 14, 2004, Ms. Morisseau was summoned into the office of Mr. Finnerty and with Mr. Finnerty III. Mr. Finnerty Jr. informed Ms. Morisseau that the firm had "tried to accommodate her," but that things had continued to "decline," and that therefore the firm had decided "to end the professional relationship." Mr. Finnerty Jr. stated that he believed that Ms. Morisseau would make a very good attorney one day. Mr. Finnerty III agreed, stating that the decision did not reflect on her performance and that the experience "was just something that didn't work out." There was no mention of insubordination.

Roxanne Sokolove Marenberg, Esq.                              May 7, 2004
Page Ten

    Ms. Morisseau subsequently spoke to Ms. Cortis of Human Resources in Baltimore, who informed her that the firm had terminated her employment on the basis of subjective "incompatibility" and confirmed that, to her knowledge, no objective acts of "insubordination" served as the basis for the discharge.

    The United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502 (1993), developed the familiar burden shifting methodology for analyzing discrimination claims.  In this case, Ms. Morisseau can establish a *prima facie* case of discrimination because she is able to demonstrate through admissible evidence that (i) she is a member of a protected class, (ii) was performing her job satisfactorily, and (iii) was terminated.  Furthermore, the plaintiff can also allege a cause of action for unlawful retaliation, because Piper Rudnick took adverse action against her only days after she complained that the New York partners of Piper Rudnick established separate and higher standards for black employees.  Piper Rudnick's shifting explanations for Ms. Morisseau's termination— i.e., "insubordination" predicated on an official "investigation" of "complaints," then no investigation but still a "couple" of determinative allegations of insubordination rising to the level of discharge, and finally neither an investigation nor insubordination but merely "incompatibility" that nonetheless warranted discharge—evidences a pretextual basis for a termination.  Moreover, characterization of Ms. Morisseau's conduct as either "insubordinate" or "incompatible" is unlikely a legitimate business objective given the fact that the Piper partnership has retained non-minority associates who have engaged in egregious conduct, including a white male employee who circulated a memorandum criticizing the management style of his team leader, Marilla Ochis.

    Additionally, Ms. Morisseau can articulate a claim for unlawful harassment under the tests set forth by the United States Supreme Court in Burlington Industries v. Ellerth, 524 US 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). In this case, the harassment visited upon Ms. Morisseau was ultimately aimed at her termination.  After Ms. Morisseau brought the conduct to the attention of the New York partnership, she was terminated.  Furthermore, Ms. Morisseau can state a cause of action under the Weider v. Skala doctrine, as the harassment and her eventual termination appear to have initiated after she exercised her ethical obligation under the Code of Professional Responsibility to oppose the use of incorrect income figures in a VCF claim in December 2003.

    It is clear that Ms. Morisseau did not violate a legitimate company rule and was unwavering in her commitment to maintaining a high standard of professionalism at Piper.  Indeed, Ms. Morisseau not only excelled in her performance and in working collaboratively with peers and supervisors, she did so in spite of being the only African-American associate in the New York office.  Accordingly, she seriously undertook the

May 7, 2004

Roxanne Sokolove Marenberg, Esq.
Page Eleven

responsibility of serving the client's interests and bringing concerns regarding diversity to the firm personnel in a professional manner.

In light of the forgoing and pursuant to Section A2 of Piper Rudnick's firmwide Employee Manual (Workplace Harassment/Discrimination Policy and Procedures),[2] we request that a non-New York City office of Piper Rudnick complete the investigation that a non-New York City office of Piper Rudnick complete the investigation triggered by Ms. Morisseau's complaints into the discriminatory and retaliatory actions of the New York partners, which culminated in Ms. Morisseau's discharge.

Pursuant to Section A2 of the Manual, we anticipate that Piper Rudnick's response will contain the complete findings of its internal investigation, which we further anticipate will address the following considerations:

1.      Confirmation that Piper Rudnick has taken necessary steps to retain all copies of all e-mail and written correspondences since Ms. Morisseau first interviewed with the firm, including preservation of the hard drives of any computer assigned to her while with the firm.

2.      If the New York partnership has at any time communicated to a third party the actual charge of "insubordination" against Ms. Morisseau, any underlying facts regarding the charge, or Ms. Levine's allegations that Ms. Morisseau was "not right for a law firm" to any of the firm's partners or other employees, including Leroy Inskeep, the senior associates who supervised Ms. Morisseau's work, or attorneys in the firm's other offices, we hereby request the names of the recipients of such communications and that immediate corrective action can be taken.

3.      If any representations are to be made or have been made to any clients, opposing counsel, or any third parties outside the firm regarding the basis of Ms. Morisseau's discharge, her performance record, or her professionalism, we request the names of the parties receiving such representations and that immediate corrective action be taken.

---

[2] Section A2 states, in pertinent part:

"[W]e are committed to investigating all complaints promptly and taking immediate and effective remedial action to stop such conduct. . . . The Firm takes all complaints and information regarding harassment and discrimination seriously and will investigate promptly and thoroughly.. . . . At the conclusion of an investigation, the Firm will inform both the alleged victim and the alleged wrongdoer of the findings and actions to be taken. . . . While this policy sets forth the Firm's standards for promoting a workplace free from unlawful harassment and discrimination, it does not limit our authority or ability to discipline or take any other remedial action for workplace conduct which is inappropriate, regardless of whether that conduct meets the definition if unlawful harassment."

Roxanne Sokolove Marenberg, Esq.                    May 7, 2004
Page Twelve

4.      In addition to the state and federal laws implicated, we believe that Heidi
Levine's demeanor and comments to Ms. Morisseau in the presence of a senior
associate (e.g., "not right for a law firm") were inconsistent with the firm's policy on
conduct, as communicated in a recent email from the firm's management regarding
elevated standards of conduct for partners at Piper.   We would like for Piper's
response to address this issue .

5.      In addition to the state and federal laws implicated, we believe the
concerted actions of Mr. Finnerty III, Denise Kaback and the other parties in the
New York office did not comply with the policies and procedures represented in the
employee manual. We believe that there was a complete failure of Piper to follow its
procedures for handling complaints of discrimination, harassment, and retaliation.
Please advise if Section A2 of the Manual did not govern the response required by
the New York office.

6.      To fulfill Ms. Morisseau's reporting obligation to the New York and
Georgia bar admissions offices, we will require a written statement from your firm
regarding the acts that served as the basis for the allegations of "insubordination."
Such statement should include a declaration regarding whether it is Piper Rudnick's
policy that associates who are "incompatible" are fired without notice, or are there
associates who have been "incompatible," or even "insubordinate" who have not
been fired.  In failing to state a basis for Ms. Morisseau's discharge, the letter from
Piper (dated April 14, 2004) does not allow her to adequately comply with the
reporting obligations of the bar admissions offices because Ms. Morisseau must
report the progressive disciplinary action that the New York partners undertook
against her.

Finally, please be advised that this letter neither contains a complete statement of
Ms. Morisseau's position with respect to this matter, reflects the totality of the facts to
be averred, nor constitutes a waiver or limitation of any of her rights, all of which are
expressly reserved herein.

Please rest assured that Ms. Morisseau has expressed a commitment to ensuring that
the unlawfully discriminatory conduct of Piper's New York City office is fully
documented, remedied, and prevented from recurring.  She does not lightly disregard the
professional respect she shared with colleagues in many of Piper's offices in just the
short time of her tenure there.  However, we have advised Ms. Morisseau regarding the
appropriate role of state and federal intervention should Piper Rudnick not share her
commitment to remedying past harms and precluding further infractions.

Roxanne Sokolove Marenberg, Esq.                    May 7, 2004
Page Thirteen

     We look forward to receiving the written findings of Ms. Morisseau's complaint under Section A2 of Piper's Handbook, Piper's statement to the New York and Georgia bar association admissions committees regarding the basis for her discharge, and hearing from you regarding the issues raised herein and whether it will be necessary for my client to avail herself of the legally created enforcement mechanisms prescribed for matters of this nature.

                       Very truly yours,

                       Gregory L. Reid

cc:   Charlene Morisseau, Esq.