UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHARLENE MORISSEAU,

                    Plaintiff,


          -against-                                              06 Civ. 13255 (LAK)


DLA PIPER, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

          Appearances:


                    Charlene Morisseau
                    *Plaintiff* Pro Se[*]


                    Bettina B. Plevin
                    Edward Brill
                    PROSKAUER ROSE LLP
                    *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

          On December 13, 2007, the Court granted defendants' motion for summary judgment

dismissing the complaint in this employment discrimination action.[1]  As previously noted, plaintiff,

despite having been granted an extension of time within which to respond to the motion, did not do

---

[*]       Plaintiff is a member of the New York Bar.  She was represented by other counsel from the
          inception of this action until April 9, 2007 (*see* DI 169) and thus almost until the scheduled
          conclusion of the discovery period on May 25, 2007 (*see* DI 17).  She subsequently was
          admitted *pro hac vice* and has prosecuted the case herself.

[1]       DI 141.

so. The only papers submitted by her, which arrived long after opposing papers had been due, were three volumes of unauthenticated purported exhibits, unaccompanied by a Rule 56.1 statement, a memorandum of law, affidavits or declarations, or other papers. No such papers ever were filed, and no excuse for the default ever was forthcoming.

Plaintiff now moves, pursuant to Rule 59(e), for reconsideration of the order granting summary judgment against her. She argues that the Court (1) applied an incorrect legal standard in determining that plaintiff had failed to satisfy the "qualification" prong of a *prima facie* case,[2] (2) did not review documents submitted in connection with a motion to compel discovery, specifically DI 56, 63 and 65, in granting summary judgment against plaintiff,[3] and (3) failed to recognize that deposition testimony submitted by defendants in support of the motion for summary judgment contravened defendants' Rule 56.1 statement and witness declarations.[4]

## Discussion

### I.    *Availability in Present Circumstances of Relief Under Rule 59(e)*

Plaintiff in substance here seeks – via Rule 59(e) and after entry of judgment – to litigate defendants' motion for summary judgment after having failed to oppose that motion when she had the opportunity to do so. Rule 59(e) should not be put to this purpose, at least in the absence of a justifiable reason for the default on the underlying motion.

---

[2]    DI 149 at 6-10.

[3]    *Id.* at 5-6, 9-14, 16, 18-19, 26-26.

[4]    *Id.* at 6.

"[R]econsideration of a previous order is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."[5]  Relief typically is restricted to situations in which the movant establishes an intervening change in controlling law, offers newly discovered evidence, demonstrates clear error of law, or shows that relief is necessary to prevent manifest injustice.[6]  Courts, moreover, "have considerable discretion in determining whether to grant or deny a motion" under Rule 59(e).[7]

Plaintiff here asserts no intervening change in controlling law and offers no newly discovered evidence.  She has not shown that relief is necessary to prevent manifest injustice.  Moreover, she plainly has no equitable call on a favorable exercise of discretion after having defaulted  – without offering any excuse or explanation even to this day –  on the motion for summary judgment, not to mention other inappropriate conduct during the course of this litigation.  She asserts nothing more than legal error, and this only after having failed to present her position before the motion was decided.

Nevertheless, little purpose would be served by ignoring clear error if there were any.  Doing so would serve only to put the parties and the Court of Appeals to a bootless expenditure of time and resources.  The Court therefore exercises its discretion to consider whether plaintiff has shown that the grant of summary judgment was inappropriate.

---

[5]      12 Moore's Federal Practice § 59.30[4], at 59-102 (3d ed. 2007).

[6]      *Id.* § 59.30[5][a].

[7]      *Id.* § 59.30[4], at 59-102.

## II.     The Motion for Summary Judgment

### A.     Facts

#### 1.     Plaintiff and the Southern Center for Human Rights

Plaintiff, an African-American woman, graduated from the Harvard Law School, where she was an editor of the law review and took a course from Stephen Bright, Esq., the director of the Southern Center for Human Rights ("SCHR"), in 2001.[8] In August 2001, she went to work at the SCHR.

Plaintiff resigned from the SCHR in June 2002.[9] Three months later, she sent a letter to the SCHR's "[b]oard members . . . and major funders, alleging many serious issues and impermissible actions."[10] She then filed a Title VII action against the SCHR and Mr. Bright[11] and subsequently sued them in the Northern District of Georgia.[12]

---

[8] Def. 56.1 St. ¶ 3; Plevin Decl. (DI 114) (hereinafter "Plevin Decl.") Ex. 25, at P00412.

[9] Plevin Decl. Ex. 26. Mr. Bright's affidavit characterized her performance as "unsatisfactory in many respects. She could not work with other people. Her disagreements with her co-workers required that she be taken off one assignment and given another one in an attempt to find someone with whom she could work." *Id.* Ex. 27, at P04091. The Court, however, does not consider the affidavit for the truth of the matters asserted.

[10] *Id.* Ex. 25, at P00412. Mr. Bright's affidavit described the letter as making "reckless and false accusations against a number of people who worked at the Center," which were "directly refuted" by the witnesses she identified in the letter *Id.* Ex. 27, at P04091.

[11] *Id.* Ex. 25, at P00412.

[12] *Morisseau v. Southern Ctr. for Human Rts., Inc.*, No. 06 Civ. 2003 (WSD-AJB).

## 2.    *Plaintiff's Tenure at Piper*

In the early spring of 2003, plaintiff applied for a job at Piper and was offered a position as a litigation associate in its New York office by co-hiring partner, Heidi Levine.[13]  Peter Bynoe, an African-American partner in the firm's Chicago office and the firm's head of diversity, flew to New York to recruit plaintiff after she had received, but before she accepted, the offer.[14]  Plaintiff started work on April 28, 2003.[15]

Plaintiff's tenure at Piper was troubled.  The following is undisputed or reflects the view of disputed evidence that is most favorable to plaintiff. The Court considers only admissible evidence in ruling on a motion for summary judgment.[16]

### (a)    *The Katz Performance Evaluation*

Among the Piper partners with whom plaintiff worked in 2003 was Aaron Katz, who had interviewed her and supported her hiring.[17]  Initially, they had no difficulties.[18]  Indeed, Katz

---

[13]     Def. 56.1 St. ¶ 4.

[14]     *Id.* ¶ 5.

[15]     Levine Decl. Ex. 1.

[16]     *E.g.*, *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir. 1998); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

[17]     Def. 56.1 St. ¶ 95.

[18]     *Id.* ¶ 97; *see* Morisseau Dep. 723:6-9; 725:14-19.

took plaintiff out to lunch.[19]  That, however, changed.

In September 2003, Katz filled out a performance evaluation form with respect to plaintiff.[20]  It called upon him to rate her on a scale from 1 to 5 on many dimensions and sought narrative comments.

Katz rated plaintiff 4 ("exceeds expectations") on most criteria, 5 ("exceptional") on three, and 3 ("meets expectations") on four.  He commended her willingness "to work late and on weekends and holidays to contribute in a crunch time."  He described her as conscientious, hard-working and "smart" and as a person with "promise of being an outstanding lawyer here."  In response to a request for suggestions for enhancement of plaintiff's development, he wrote:

> "Charlene is working hard and becoming a valued part of the firm in the short time she has been here.  She should continue on this path.  My one suggestion at this point would be to work on her writing and analysis, to achieve greater conciseness and a nuanced application of the law to the particular question posed.  Charlene is well on the way to this, and has the makings of an outstanding legal writer.  This will come with more experience, and she should set this as an objective for the year."[21]

When plaintiff received this review, she was unhappy with the quoted comment and said that it raised concerns about whether she would be assigned to "cases that were substantive."[22] She asked to meet with Mr. Katz to discuss it, to which he readily agreed.[23]  Plaintiff arrived for the

---

[19]

Def. 56.1 St. ¶ 98; Morisseau Dep. 725:20-23.

[20]

Plevin Decl. Ex. 28.

[21]

Plevin Decl.¶ 29 & Ex. 28.

[22]

Morisseau Dep. 731:5-732:14; *see also id.* 735:19-736:7.

[23]

Katz Dep. (Plevin Decl. Ex. 4) 66:7-19; *see also* Morisseau Dep. 747:7-22.

meeting with "a tabbed binder of all of her written product with a view [in Katz's opinion] toward . . . having [him] kind of justify the review in a line-by-line sort of way."[24]  In any case, however, plaintiff described the conversation as "a rather detailed enough discussion."[25]  Nevertheless, she followed up the meeting with a memorandum to Katz in which she said that "it is clear that we diverge tremendously in our assessments of the quality of" the materials she had presented.[26]  Further, she continued to press Katz for an additional meeting.[27]

(b)     The Ochis Incident

Marilla Ochis was a partner in Piper's New York office who interviewed and met with plaintiff more than once before plaintiff was hired.[28]  After plaintiff arrived, she was assigned to work with Ochis, among other partners.

On October 20, 2003, plaintiff sent Ochis an e-mail to update Ochis on the status of her assignments.[29]  Ochis responded with an e-mail that prioritized plaintiff's assignments.  It stated, among other things:

---

[24]
Katz.Dep.66:16-23.

[25]
Morisseau Dep. 751:13-22.

[26]
Plevin Decl. Ex. 10.

[27]
Def. 56.1 St. ¶¶ 118, 120; Plevin Decl. Ex. 11.

[28]
*Id.* ¶¶ 10-11.

[29]
*Id.* ¶ 13; Finnerty Decl. (DI 114) (hereinafter "Finnerty Decl.") ¶ 26 & Ex. 5, at D002766.

"In terms of your last question, I don't need a running update at all. Just the understanding that new or follow-up requests may well take priority over other ongoing projects that you are trying to manage in an orderly fashion. The world would be a nicer place if we could all keep our ducks all in a row, but if the job were that easy, anyone could do it!"[30]

Plaintiff apparently took offense at the last statement and responded the following day with an e-mail to Ochis stating in part that plaintiff found the last part of Ochis' e-mail "extremely unnecessary."[31]

Believing there had been a misunderstanding, Ochis went to plaintiff's office to explain that she "hadn't meant anything remotely offensive, nothing negative or in any way offensive by the email."[32] While Ochis and plaintiff do not agree on exactly what transpired,[33] plaintiff's version is that Ochis was angry when she arrived. Plaintiff, in what she conceded was not "a quiet way," told Ochis to "back up," went to the door, opened it, and told Ochis that "if we're going to have this conversation, it really needs to be with a third-party present."[34]

Shortly thereafter, plaintiff contacted Karen Litscher Johnson, Piper's firm-wide director of professional development, and told her, "[L]ook, this is it, I can't do this any more . . .

---

[30]

Def. 56.1 St. ¶ 14; Finnerty Decl.¶ 26 & Ex. 5, at D002766.

[31]

Def. 56.1 St. ¶ 15; Finnerty Decl.¶ 26 & Ex. 5, at D002767.

[32]

Def. 56.1 St. ¶ 16; Ochis Dep. (Plevin Decl. Ex. 6) 60:8-61:4.

[33]

Ochis' version is contained in Exhibit 5 to the Finnerty declaration. The Court does not refer to it here, as it is unsworn. As will appear below, however, it is admissible for the non-hearsay purpose of establishing the information known to Finnerty when he decided to terminate plaintiff's employment.

[34]

Morisseau Dep (Plevin Decl. Ex. 2) 271:16-273:21.

. I have got nowhere, I have no room to move" and that plaintiff "had just reached a point of departure," referring to her relationship with Ochis.[35]

Later that day, Ochis e-mailed plaintiff as follows:

"Charlene, I understand that you were upset this morning but thought that your tone/ volume were out of proportion to the events. So, I do think that having another person present will help ensure that there are no further misunderstandings. Heidi [Levine] has agreed to facilitate a discussion this afternoon, probably around 4:30. I've let Karen [Litscher Johnson] know that this is how we will handle it at this point. Talk to you later this afternoon."[36]

In due course, plaintiff spoke with Johnson and Levine and told them that plaintiff believed that "the underlying problem is . . . I just don't trust Marilla any more."[37]

A short time later, Piper agreed to plaintiff's request that she no longer work for Ochis.[38] Plaintiff concedes that Ochis never said anything to her that could be construed as a race-conscious comment.[39]

(c)     The Rappaport Incident

Plaintiff began working with Douglas Rappaport, another New York litigation partner, on cases involving the 9/11 Victims' Compensation Fund ("VCF") almost immediately after

---

[35]

Id. 274:11-275:24; 278:8-15 (discussed nothing but Ochis in that conversation).

[36]

Def. 56.1 St. ¶ 18; Finnerty Decl. ¶ 26 & Ex. 5, at D002773.

[37]

Morisseau Dep. 286:20-288:7.

[38]

Def. 56.1 St. ¶ 21.

[39]

Id. ¶ 22; Morisseau Dep. 222:5-12.

she started at Piper.[40]  The background against which the problem with Rappaport arose was that the VCF used income included on victims' tax returns in determining awards for survivors.[41]

In November or early December 2003, Morisseau raised with Rappaport a concern with respect to about $700,000 of income included in a tax return previously filed by a victim of the 9/11 attacks that had been provided to Piper by the victim's widow.[42]  Plaintiff said that she personally believed that the tax return "was fraudulent" because she felt that the numbers did not "add up."  She brought the matter to Rappaport's attention.[43]

Rappaport's team sought additional information about the victim's income. Rappaport asked Linda Thomas, another partner at Piper and an expert on executive compensation, to determine the source of the income.  She reported that the income was part of the victim's severance package from a former employer.  At Rappaport's direction, the $700,000 was reflected in the application to the VCF as severance received from the former employer.[44]  But plaintiff's problems with Rappaport continued.

A short time later, plaintiff claims, Rappaport tried to blame her for a mistake in connection with the VCF cases.[45]  Then, on December 23, 2003, Rappaport asked plaintiff to prepare

---

[40]   Def. 56.1 St. ¶ 36.

[41]   *Id.* ¶ 38.

[42]   *Id.* ¶¶ 37, 39; Rappaport Dep. (Plevin Decl. Ex. 8) 43:13-44:18.

[43]   Def. 56.1 St. ¶ 40; Morisseau Dep. 552:7-554:24.

[44]   Def. 56.1 St. ¶¶ 41-42.

[45]   *See* Morisseau Dep. 536:12-539:9.

two form letters relating to the VCF cases.[46]  According to plaintiff, she at first did not respond. Then, after speaking to Heidi Levine, she told Rappaport that she could not "prepare the letters under [her] signature."[47]  Rappaport, according to plaintiff, became angry and told plaintiff to "get [him] those letters."  Plaintiff again insisted that she would not "put the letters under [her] signature." Rappaport, she said, responded "[f]ine, just get me the letters."  She then did so.[48]

Rappaport shortly thereafter mentioned the incident to Joseph Finnerty III ("Finnerty"), the head of Piper's New York litigation practice.[49]

After December 2003, plaintiff was not staffed on the VCF cases.[50]  But, according to plaintiff, there were further difficulties with Rappaport, as will appear.

(d)     The Events of February through April 2004

Heidi Levine was among the Piper partners who met with plaintiff before she was hired.  She in fact signed the letter offering plaintiff a job.[51]

---

[46]

Rappaport Dep. 158:6:25; *see also* Morisseau Dep. 565:2-24.

[47]

Morisseau Dep. 567:14-568:5.

[48]

*Id.* 568:6-19.

[49]

Def. 56.1 St. ¶ 46; *see also* Finnerty Decl. ¶ 23; Rappaport Dep. 163:6-18.

Finnerty should not be confused with Joseph Finnerty, Jr. ("Finnerty Jr."), the former head of the New York office.  Finnerty Decl. ¶ 3.

[50]

*Id.* ¶ 48.

[51]

Def. 56.1 St. ¶ 66.

*(1)     The Annual Performance Review – Plaintiff Rebuffs Levine*

On February 19, 2004, Levine e-mailed plaintiff in advance of a scheduled meeting at which plaintiff was to receive her annual review from Leroy Inskeep, a partner in Piper's Chicago office.  The e-mail asked for a copy of a document relating to a matter on which plaintiff and Levine were working and then advised plaintiff that Levine had been asked to sit on the meeting.  Levine explained that "we try to always have at least one NY litigation partner in each room with each associate."[52]  Plaintiff responded by questioning whether everyone has someone sit in. Levine responded, "Yes."[53]  Plaintiff responded, "i'd like to have the mtg alone, without a NY partner there. is that possible?"  Levine said that was not the way it was done, but offered that plaintiff could communicate her wish to Inskeep.[54]

The performance review meeting took place soon thereafter.  Plaintiff was present as were Inskeep, Finnerty III, Finnerty Jr., Levine, and Mathias.  Johnson was present by phone.[55] Neither side has identified any evidence as to the substance of the discussion.

---

[52]

Levine Decl. Ex. 4.

[53]

*Id.*

[54]

*Id.*

[55]

Levine Dep. (Plevin Decl. Ex. 5) 120:5-121:3.

*(2)     The March 22 Meeting With Cannady*

In the meantime, plaintiff claims, she overheard Ochis speaking with Rappaport and Katz about her in the hallways[56] and sought a meeting with Sarah Cannady, director of professional development in Piper's New York office. The two got together, after some delay, on March 22, 2004. Plaintiff complained to Cannady of what she regarded as inappropriate comments by Ochis, Katz, and Rappaport. Cannady said she would take care of it.[57] Plaintiff testified that she does not think she raised any issue of race discrimination on this occasion.[58]

*(3)     The Next Incident With Levine*

By some time in March, plaintiff was assigned to work with Levine and others on matters for Wyeth Pharmaceuticals. In the middle of that month, Levine spoke to Natalie Zaidman, a Piper lawyer based in its Baltimore office, and the two decided that it would be a good idea for Zaidman to come to New York and to have a meeting "with all of the players."[59]

On March 29, 2004, plaintiff sent Levine and Zaidman an e-mail with an attached chart setting forth what plaintiff described as "a summary of [her] work allocation for the client" and that listed a variety of ongoing responsibilities. The chart listed only plaintiff as responsible for each

---

[56]   Morisseau Dep. 232:23-233:6; 235:12-236:21; 760:20-761:14.

[57]   Morisseau Dep. 975:10-985:11.

[58]   *Id.* 983:9-18.

[59]   Levine Dep. 173:23-175:3.

of the tasks.[60]  This evidently did not sit well with Levine, who responded as follows:

> "I am in favor of having a list of tasks that we, as a team, perform on a regular basis on the work, but your implication in the attachment that you are the only person staffed on each task is inaccurate, since every person on our team contributes to each and every task listed, including me, Natalie, Holly, Marcie, Lori and often Jen.  What would have been most productive is to have listed the tasks alone so that we can discuss how to accomplish each one in a substantive way, rather than focusing on who is responsible for each item.  Although I understand that your focus is on what you are specifically responsible for, and I want to address that when you, me and Natalie meet tomorrow, please understand that the main focus for our team and the client is on the big picture, meaning how we are to accomplish each task in the most efficient way to get the work done and what goes into performing each item.
>
> "We do not need to get into a back and forth email dialogue about this today, b/c when we meet tomorrow, we can talk in person.  I hope we can resolve this in a way that meets with everyone's satisfaction.  I am looking forward to working on the memos themselves during our discussion tomorrow to get the work product done and out the door.  Going through the various memos together is a good way to accomplish multiple things, especially in light of our 'team' mentality.
> "Thank you –"[61]

Plaintiff, however, did not wait until the next day.  She fired back an e-mail denying any implication that she was the only one responsible for the various tasks and emphasizing a concern that she "not become marginalized in [her] work assignments." She went on to explain that "[w]hile it can make sense for all of the firm's clients to have one person allocated to being completely integrated in all the administrative responsibilities for that client, it is counterintuitive to my professional development."[62]

---

[60]   Levine Decl. Ex. 7, at D000452-53.

[61]   *Id.* at D000452.

[62]   *Id.* at D000451.

Levine responded briefly, suggesting that they talk on the following day, but pointing out that the work, rather than being administrative, was "part of the most important work we do for Wyeth."[63]  Again plaintiff responded, this time admitting that the work was important, but complaining that, in her view, it did "not add to [her] skill set as a litigator in a meaningful fashion."[64]

Levine took considerable offense at plaintiff's behavior, regarding the plaintiff as having been "very adversarial and aggressive, and really raising issues unnecessarily about what she was supposed to do versus what other people were supposed to do."[65]

Undisputed evidence shows that plaintiff kept it up at the meeting, which took place late in the morning on the next day.[66]  She was "argumentative, defensive and contentious about every single thing [Levine] said."[67]  As Levine described it (without contradiction by plaintiff, so far as the record discloses):

> "[I]t had taken a turn, between Monday and Tuesday, from being about the work and client service – which is what we're here for in the law firm – to all about [plaintiff].
>
> "And she made the meeting all about her, just like she did in this chart.  And it was what was her job and her responsibility and how she could do less, and how she was doing too much and how she wasn't happy; that she thought that she was doing work

---

[63]

   *Id.*

[64]

   *Id.* Plaintiff added:  "I enjoy working with you Heidi and you know that.  And I depend on you."  *Id.*

[65]

   Levine Dep. 176:15-177:23.

[66]

   Morisseau Dep. 373:24-374:5; Levine Dep. 182:11-185:17.

[67]

   Levine Dep. 182:9-14.

that was meant for paralegals, and that it was beneath her, and that this type of work was – was beneath her and that she was an – actually I think she may have said that she was a Harvard law grad and she should be doing better work and different types of work and that she – and I tried to explain to her that this was among – the most very important work for the client, and the client was an extremely important client for the firm, and that it was all a good learning experience, and that I thought that there were aspects of the job that I gave her to do that were some of the things that I loved most about my job, which was very similar to what she was doing in some ways."[68]

(4)     *Levine Complains to Management – March 29-30, 2004*

On March 29, 2004, Levine made an appointment to meet with Leroy Inskeep of the Chicago office while he was attending meetings in the New York office.[69]  Levine scheduled the meeting "to address with the management of the office and the firm the insubordinate and inappropriate behavior of [plaintiff] that had risen to a level that made me feel that I needed to address it with those members."[70]  And at approximately 10:00 on March 30, Levine met with Leroy Inskeep, Finnerty, Finnerty Jr., Karen Johnson, and others.[71]

Levine complained that plaintiff "was acting in a way that [wa]s not appropriate in a law firm[,] that was offensive and egregious."  She said "that [she] needed assistance and advice on how to handle it."[72]  She reminded the group that plaintiff, in her brief tenure at the firm, had had

---

[68]

      *Id.* 183:7-184:11.

[69]

      *Id.* 110:3-6.

[70]

      *Id.* 109:5-14.

[71]

      *Id.* 107:15-110:15.

[72]

      *Id.* 110:25-111:17.

significant issues with other partners, had refused to work with them, and had been belligerent and insubordinate. Her behavior, Levine said, was obstructing the substantive work on her case.[73]

A discussion followed about whether plaintiff's behavior rose to the level of termination. Levine suggested instead that someone with management authority explain to plaintiff that her behavior had been inappropriate, that it needed to change and to give her a warning. At that point, Levine phoned Amy Schulman, a more senior New York litigation partner, and described what was taking place. Schulman was put on a speaker phone and supported Levine's suggestion.[74]

After the meeting, Finnerty asked two of the firm's partners with expertise in employment matters to advise him, Finnerty Jr., and Inskeep – the individuals responsible for decisions concerning plaintiff's employment – about the situation.[75] The employment partners in turn asked Denise Cortis, the chief human resources officer, and Denise Kaback to gather information and assist management.[76]

### (5) The March 30 Meeting With Cannady

Plaintiff also had a meeting with Cannady on March 30, 2004, this to follow up on the March 22 meeting.[77] While there is no direct evidence as to whether this meeting preceded or

---

[73]

*Id.* 111:21-112:24; Finnerty Decl. ¶ 15.

[74]

Levine Dep. 114:14-116:13; Finnerty Decl. ¶ 16.

[75]

Finnerty Decl. ¶¶ 17-18.

[76]

*Id.* ¶ 19.

[77]

Morriseau Dep. 986:4-20.

followed the Wyeth meeting with Levine, that question is immaterial to the disposition of the motion.[78]

      According to plaintiff, Cannady reported that she had spoken to Rappaport, who had agreed to stop talking about plaintiff in the hallways. Plaintiff responded that she was not satisfied because Rappaport was not alone. She asked Cannady if she had spoken to Ochis and Katz and added that "this isn't just about the conversations." She went on, she claims, to say that she felt that she was "being treated differently at this firm," that she was "still the only African American in the firm,"[79] that she did not feel that "the firm [wa]s committed to diversity," and that she did not believe that African Americans [we]re getting credit for their work or their performance reviews."[80] Plaintiff said also that she thought her performance reviews reflected discrimination.[81] Ms. Cannady said that she did not think that she was the right person with whom to talk about this and referred

---

[78]     Levine's uncontradicted testimony that the Wyeth team meeting, at which plaintiff was present, began in the late morning and the fact that plaintiff's account of her meeting with Cannady does not refer to the Wyeth meeting suggest that the Cannady meeting occurred first.

[79]     This of course was demonstrably untrue. Def. 56.1 St. ¶¶ 262-63. For example, plaintiff was recruited by Mr. Bynoe, an African-American partner based in Piper's Chicago office, *id.* ¶ 5, and spoke in her deposition of other minority associates. Indeed, as noted in the text, she asserted at the same meeting that "African Americans" were not "getting credit for their work on their performance reviews," something that would be very difficult to say if in fact there were no other African-Americans.

[80]     *Id.* 987:24-991:22

[81]     *Id.* 995:9-997:22.

plaintiff to Ms. Johnson.[82]  Shortly after the meeting, Ms. Cannady left for Texas and was out of the office for about a week.[83]

(6)     <em>March 31 through April 7, 2004</em>

Late in the afternoon of the following day, March 31, 2004, Levine received drafts of escrow instructions and another document, presumably relating to settlement of a Wyeth case, from a lawyer at another firm along with a request for comments on the documents.[84]  Levine forwarded the incoming e-mail to plaintiff and asked her whether she knew what the outside lawyer was referring to with respect to an escrow agent.[85]  The following then ensued through a series of terse e-mails:

| | |
|---|---|
| Plaintiff: | "I am unable to assist you." |
| Levine: | "what does that mean?" |
| Plaintiff: | "I am answering your first question.  I am unable to help you.  I do not have any information." |
| Levine: | "Did you read the attachments and try to figure it out?  It clearly has to do with settlement issues and you are the only attorney here who has dealt with Linda Love on post-settlement issues.  You are the appropriate person to help me with this.  Thank you." |
| Plaintiff: | "I can read the attachments tomorrow.  I am otherwise occupied on |

---

[82]    *Id.* 997:3-5; *see also id*. 992:5-7; 993:8-9.

[83]    *Id.* 997:23-998:2.

[84]    Levine Decl. Ex. 11, at D000987.

[85]    *Id.*

a billable matter, with a deadline for tonight. I can review the attached document at that time. It may be worthwhile to bring OB in on this so that we both know what is happening with the recent settlements. Thank you."[86]

At that point, Levine responded that plaintiff's original response had been unacceptable and emphasized that she of course would have agreed to plaintiff getting to the matter on the following day if plaintiff "had simply stated up front that [she] was working on another deadline." She repeated that it was inappropriate for plaintiff simply to refuse to help "with no explanation" and urged that the two discuss any problem there might be between them.[87]

Levine and plaintiff met on April 1, 2004 and together called the outside lawyer. There was no discussion, however, about the *contretemps* of the preceding day.[88]

In the meantime, Cortis and Kaback gathered information about plaintiff's tenure at the firm pursuant to the request by the employment partners whom Finnerty had consulted. Ochis and Rappaport sent them lengthy e-mails describing their experiences in detail.[89] While the unsworn e-mails are not admissible for their truth, they later were read by Finnerty[90] and thus are appropriately considered with respect to the basis on which he later made the decision to terminate plaintiff.

---

[86] *Id.* at D9000986-87.

[87] *Id.* at D000986.

[88] Morisseau Dep. 499:4-19.

[89] Finnerty Decl. Exs. 4-5.

[90] *Id.* ¶ 21.

Rappaport's e-mail recounted the incident of December 23, 2003. He stated that he had asked plaintiff to draft two short letters to the VCF, but that she had "walked into [his] office[,] . . . flatly refused to write the letters," and told Rappaport to "do them" himself. When plaintiff was asked why, Rappaport said, she responded that he had said something in front of two clients at a meeting the preceding week that plaintiff construed as blaming her for an error. Rappaport went on to say that he had spoken to plaintiff again later the same day, told her that he had not intended to blame her for the error and did not recall having done so. He asked that she immediately tell him if in the future he did anything that she regarded as slighting her or unfair. His e-mail informed firm management that "[i]n [his] 13 years of practicing law, [he] ha[d] never seen an attorney, much less a junior associate, engage in the outright insubordination that [plaintiff] exhibited that day. Her conduct was both utterly disrespectful and reflected an indifference to the needs of [the] clients – two September 11 widows."[91]

Ochis's e-mail related plaintiff's response to the "ducks in a row" e-mail discussed above. It described as follows what occurred when Ochis went to plaintiff's office to clear up the confusion about the comment:

> "I closed the door on the way into her office to preserve her privacy. I got no further than something along the lines of: 'What is going on? All I meant was that we all wish there were more predictability to this job, but that you should not expect too much orderliness', and she began reprimanding me, telling me that my email comment was inappropriate and offensive, that if I wanted to say something to her I should just say it, that I needed to be more clear, that all I do is pick at her and criticize everything she does, and that I am too sensitive. She told me that I needed to be less sensitive, that I should just tell her straight-out what I mean and not 'dance around it' because she herself is not at all sensitive. (I told her that she was actually the most sensitive, reactive person I had ever worked with, but basically I could

---

[91]

    *Id.* Ex. 4.

hardly get a word in edgewise.) She was yelling much of this at me. The more I tried to tell her what I had meant, the more she either told me that she already knew the information or that I had said it wrong, and she continued yelling at me. No matter what I said, I could not decrease her intensity. For example, I said that it seemed like she was frustrated or felt defensive, and that may have affected how she interpreted my email, but that I was actually trying to be helpful, acknowledging the frustrations of the job. She literally yelled 'Don't tell me what I feel. This is a job, Marilla, it's not about feelings.' She also said that she didn't appreciate me closing the door.

"I had never encountered a situation like this one, could not seem to get through to her myself, so I said that I thought we needed a third person present to avoid further misunderstandings. She jumped up and showed me to the door."[92]

Ochis attached to her e-mail to Cortis and Kaback two other e-mails that Ochis had sent to Amy Schulman on October 21, 2003, immediately after her confrontation with plaintiff. Those contemporaneously described plaintiff has having "completely flipped out." They said that the incident was "the most bizarre encounter [that Ochis had] ever had to deal with in [her] entire career."[93]

Finnerty read these e-mails and spoke directly with Rappaport and Ochis about their experiences. He concluded that several partners were experiencing great difficulty working with plaintiff because of her unwillingness to conform her conduct to the direction of the partners with whom she worked and the insubordination she had exhibited. He, Finnerty Jr. and Inskeep concluded that plaintiff's conduct was unacceptable and decided that she would have to acknowledge the problems with her conduct and correct her behavior, perhaps with the assistance of a professional

[92]
       *Id.* Ex. 5.

[93]
       *Id.* at D002768-69.

coach, in order to continue with Piper.  Accordingly, on April 5, 2004, he sent her an e-mail setting up a meeting for April 8, 2004.[94]

*(7)    Plaintiff's Departure*

Finnerty and Inskeep met with plaintiff on April 8.  Kaback was present to document the meeting.

According to Finnerty, he explained to plaintiff that, based on the information he had received, her conduct was unacceptable.  He offered her two options -- (1) acknowledging and correcting the problem or (2) discussing separation from the firm – and gave her a few days to consider them.[95]

Plaintiff's account of the meeting is not much different save that she testified at her deposition that she "raised [a] concern that [she] was being retaliated against and . . . singled out at the firm.[96]  She did not, however, say that she mentioned that she thought she was being singled out on the basis of race or what she thought was the motive for the alleged retaliation.  Apart from that, she agreed that she was told in substance that the issue was with her behavior and the way in which she was interacting with partners, not her substantive work.[97]  She agrees that she was presented with two options, although she characterized the first option as acknowledging that she was

[94]    Finnerty Decl. ¶¶ 27-30 & Ex. 6.

[95]    Finnerty Decl. ¶¶ 31-35.

[96]    Morisseau Dep. 910:2-9.

[97]    *Id.* 653:21-654:24.

"insubordinate and . . . walk[ing] with the firm hand in hand in trying to figure out how to correct [her] insubordinate behavior."[98]

Following the meeting, Levine sent Kaback an e-mail reminding her that the firm should hire a "coach" for plaintiff if plaintiff chose the first option.[99]

On April 13, 2004, Finnerty and Kaback met with plaintiff, who refused to acknowledge that she had done anything wrong and told them that she would not choose either of the options presented on April 8.[100] On the following day, Finnerty, Finnerty Jr., and Kaback met with plaintiff again. Finnerty told her that she was terminated.[101] The firm offered her a severance package, including three months' salary and benefits, in exchange for, among other things, a release.[102]

### 3. Plaintiff's Admission to the Bar

Although plaintiff had passed the July 2001 New York bar examination,[103] she had not been admitted to practice in New York during her entire tenure at Piper. Indeed, she did not

---

[98]

Id. 656:9-21.

[99]

Levine Decl. Ex. 17.

[100]

Finnerty Decl. ¶ 35.

[101]

Id. ¶ 38; Morisseau Dep. 707:18-710:10.

[102]

Id. ¶ 38-39 & Ex. 9.

[103]

Plevin Decl. Ex. 25, at P00412.

apply for admission until June 14, 2004, following her termination.[104]   The amended complaint alleges that Piper retaliated against her by threatening to interfere, and interfering, with her application.  Among the alleged motives for the retaliation was her filing of an EEOC charge, which allegedly was filed on February 5, 2005.[105]

This claim of post-employment retaliation involves two assertions.  First, plaintiff alleges that Piper attorney Peter Pantaleo told one of plaintiff's several prior counsel that the firm had not been aware when it hired plaintiff that she had not been admitted to practice and threatened to report this to appropriate authorities unless plaintiff signed a release. Second, the amended complaint alleges that Piper sought to discourage employees from submitting testimony or affidavits in support of plaintiff's application.[106]   In fact, however, the focus of plaintiff's problems in obtaining admission actually was something else.

Steven Bright of the SCHR submitted to the Second Department an extremely negative affidavit concerning the plaintiff.[107]   He wrote that "[plaintiff] held herself out as an attorney" although she had not been admitted to the Bar, made "reckless and false accusations regarding a number of people who worked at [SCHR]," and "appears unable to separate reality from fantasy."  He concluded that [a]ll this reflects very poorly on the professional qualifications of

---

[104]

Def. 56.1 St. ¶ 192.

[105]

Am Cpt ¶¶ 33, 65-83, 121-24.

[106]

*Id.* ¶¶ 78-79.

[107]

The affidavit is in the record.  Plevan Decl. Ex. 27.

[plaintiff] to practice law.'"[108]   In a subsequent interview with a member of the Ninth District Committee on Character and Fitness (the "Committee"), he said that plaintiff was either "delusional or a pathological liar" in making allegations against fellow employees.[109]   While Professor Charles Ogletree of Harvard Law School, who also was president of the SCHR, supported plaintiff's application and spoke of her in glowing terms, he told the Committee that her allegations against the SCHR all had been investigated and that the incident involving her at the SCHR was "out of character."[110]

A subcommittee of the Committee held a hearing on February 24, 2005.   The principal issues before it were whether plaintiff had engaged in the unauthorized practice of law while at the SCHR and whether the circumstances of her departure from that institution reflected adversely on her fitness to practice law.

The subcommittee report, dated April 19, 2005, questioned plaintiff's judgment, termed her action with respect to the SCHR "extremely provocative," found that "[c]learly there were severe personality conflicts at the Center," and described plaintiff as having "an uncompromising point of view and [being] without much flexibility."[111]   Nevertheless, it concluded

---

[108]   *Id.* at P04091-92.

[109]   *Id.* at P00415.

[110]   *Id.* at P00415-16.

[111]   *Id.* at P00417.

The report appears to be admissible under FED. R. EVID. 803(8), but it is unnecessary to decide this question.

that plaintiff's response to the charge of unauthorized practice in Georgia was credible, pointed to several positive comments in her support, and recommended that plaintiff be admitted.

While the subcommittee report focused almost entirely on the events in Georgia, it contains the only even arguably admissible evidence supporting plaintiff's post-employment retaliation claim, stating that "an allegation of the unauthorized practice of law by the applicant was alluded to by Piper."[112]  But it is undisputed that Piper advised the Second Department on February 17, 2005 that it did not "believe that [plaintiff's] conduct at the firm raises any issue that should disqualify her from admission to the bar."[113]

Plaintiff in due course was admitted by the Second Department.[114]

---

[112]

Plevin Decl. Ex. 25, at P00414.

At her deposition, plaintiff was asked the basis for the allegation that the firm discouraged its personnel from supporting her application.  Her response makes clear that the allegation is based entirely on inadmissible hearsay and, in one case, a memorandum that quite plainly does not support her position.  Moriseeau Dep. 124:3-129:12.  The memorandum reads, in relevant part: "Recently, Charlene has been contacting people at the firm to discuss an investigation the firm is conducting regarding certain charges made by her against the firm. If your assistance is needed in the investigation, I will let you know.  If you have been or are contacted by Charlene or somebody on her behalf, let me know about that.  *It is up to you whether or not you talk to her.*"  Plevin Decl. Ex. 18 (emphasis added).

[113]

Def. 56.1 St. ¶ 216; Plevin Decl. Ex. 24.  The subcommittee report confirmed that this "extinguishe[d]" any claim by Piper that plaintiff engaged in the unauthorized practice of law.  Plevin Decl. Ex. 25, at P00414.

[114]

Morisseau Dep. 10:6.  In a statement submitted in a state court matter, plaintiff stated under penalties of perjury that "the members of the Second Department Committees on Character and Fitness (a.k.a. Ninth Judicial Grievance Committee); the Office of Committees on Character and Fitness; the Office of the Chief Clerk, James Pelzer, and the judges of the Appellate Division, Second Department . . . , attempted to deny [her] admission as a practicing attorney in New York State."  DI 52, Ex. A, first unnumbered page, ¶ 4.

B.      Analysis

Plaintiff's Rule 59(e) motion focuses on four claims, viz. employment discrimination, retaliatory termination of her employment, post-employment retaliation, and breach of contract.

1.      The Employment Discrimination Claim

In order to withstand a motion for summary judgment, an employment discrimination plaintiff first must adduce evidence that would permit a reasonable trier of fact to find that (1) she was a member of a protected class, (2) her job performance was satisfactory, (3) an adverse employment action occurred, and (4) the action occurred in circumstances giving rise to an inference of discrimination.[115]  If such evidence is adduced, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their actions.[116]  Assuming the defendants do so, the burden shifts back to the plaintiff to show that the evidence as a whole would justify a reasonable trier of fact in finding "that the defendant intentionally discriminated against the plaintiff."[117]

In this case, plaintiff is a member of a protected class.  The termination of plaintiff's employment was an adverse employment action.[118]  The Court assumes, as it did in deciding the

---

[115]

See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

[116]

See id.

[117]

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

[118]

Plaintiff of course submitted no papers in opposition to the summary judgment motion and so did not there claim that she suffered any other adverse employment action during her tenure at Piper.  Nor do her present papers make any such assertion.  Accordingly, there is no occasion to consider any disparate treatment claim other than the contention that plaintiff was fired on account of her race.

summary judgment motion, that there is sufficient evidence of qualification for the job to satisfy the minimal requirements of a *prima facie* case.[119]

The fourth prong of the *McDonnell Douglas prima facie* case is whether the action occurred in circumstances giving rise to an inference of discrimination. This of course is substantially the same issue that, if plaintiff makes out a *prima facie* case and the employer articulates a non-discriminatory reason for its action, is presented at the third stage of the analysis. As Piper articulated such a reason, it made no difference whether the issue was considered as part of the *prima facie* case analysis or as the ultimate question on the motion. The question was whether, viewing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could conclude that race was a motivating factor in the decision to fire the plaintiff.

Piper hired plaintiff slightly less than a year before it fired her. Indeed, it went to the effort of having the African American partner who headed its diversity efforts, come from Chicago to recruit plaintiff. Once she was hired, her performances reviews indicated that her substantive work was well regarded. Nevertheless, her behavior, viewed as it must be for this purpose solely as it is depicted in the uncontradicted admissible documents and her own admissions, was quite objectionable. Several of the individuals with whom she had difficulties had been involved in hiring

---

[119]  In seeking relief under Rule 59(e), plaintiff argues that the Court erred on the summary judgment motion by holding her to a more stringent standard of qualification than was warranted. DI 149, at 6-10. As the previous decision makes clear, however, the Court did no such thing. While it recognized that it that plaintiff's failure to perform in a satisfactory manner "arguably" could be fatal to her *prima facie* case in the *McDonnell Douglas* sense of that term, it did not so hold. It instead assumed the existence of a *prima facie* case, but nevertheless concluded that "[t]here [wa]s no basis from which any reasonable jury could find that race played a factor in the decision to terminate plaintiff, as there [wa]s no evidence to support the notion that plaintiff's difficulties were race-related." *Morriseau v. DLA Piper*, 2007 WL 4292030, at *5 (S.D.N.Y. Dec. 3, 2007).

her, including Levine who actually signed the offer letter. Plaintiff has pointed to no evidence of any questionable race-conscious comment by anyone at Piper during her entire tenure at the firm. She was not even just terminated – she was offered the opportunity to work to correct her problem, an opportunity she did not accept. In short, the Court had no doubt when it decided the motion for summary judgment that no rational jury could find that race was a motivating factor in the decision to terminate plaintiff. Nothing to which plaintiff has pointed in the current motion has altered that conclusion.[120]

Finally, plaintiff's contention on the present motion that application of the *McDonnell Douglas* burden-shifting analysis was erroneous because there was sufficient direct evidence of discrimination to place the burden on the defendants under *Price Waterhouse*[121] is simply wrong. As the Court of Appeals has said:

> "To warrant a *Price Waterhouse* burden shift, the plaintiff must initially show that 'an impermissible criterion was in fact a "motivating" or "substantial" factor in the employment decision.' [Citations omitted] Only after it is shown that 'the forbidden animus was a motivating factor in the employment decision' does the burden shift

---

[120]

To be sure, plaintiff's deposition is filled with her personal opinions and speculation that various individuals acted out of discriminatory motives and that minority associates were treated less favorably than others. But the Court has found no instance in which there is any admissible evidence – that is, testimony by plaintiff based on personal knowledge as opposed to conjecture, opinion or hearsay – to support any of this.

A good example, though it is not germane to the claim of discriminatory termination, is plaintiff's testimony that Katz's performance review was discriminatory. The only evidence to back up that charge is this: "Q. You believe that Aaron Katz discriminated against you? A. Yes, I do. Q. What makes you believe that? A. I believe his reviews of the – performance reviews were discriminatory. I think he took credit for my work, parceled out credit for my work to the associates he wanted to promote." Morisseau Dep. 717:9-17. Needless to say, plaintiff's beliefs in this regard, which so far as the record discloses are not even based on personal knowledge, would not be admissible even if relevant.

[121]

DI 149, at 11 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) (plurality opinion)).

to the employer to prove that it would have made the same decision absent the discriminatory factor. [Citation omitted]

"Because the plaintiff must show that the evidence is *sufficient* to allow a factfinder to infer both permissible and discriminatory motives, [citation omitted], the plaintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the *de minimis* showing required to establish a prima facie *McDonnell Douglas* case [citation omitted]. The types of indirect evidence that suffice in a pretext case to make out a prima facie case–or even to carry the ultimate burden of persuasion-do 'not suffice, even if credited, to warrant' a *Price Waterhouse* burden shift. [Citation omitted]. Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers 'that may be viewed as directly reflecting the alleged discriminatory attitude.' [Citations omitted]. In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."[122]

Here there is no admissible evidence that race was a motivating or substantial factor in any employment decision.

2.      *The Retaliatory Discharge Claim*

Plaintiff argues that summary judgment dismissing her retaliatory discharge claim was inappropriate. There was, she asserts, a genuine issue of material fact as to whether there was a causal connection between her complaint on March 30, 2004 to Ms. Cannady – viz., that plaintiff's performance reviews, in her opinion, did not reflect her performance and that, also in plaintiff's opinion, this was attributable to her race – and her expression of concern about possible retaliation at the April 8 meeting with Finnerty and others and her termination in April 2004.

---

[122] *Raskin v. Wyatt Co.,* 125 F.3d 55, 60-61 (2d Cir. 1997). *Accord, e.g., Sista v. CDC Ixis North Am., Inc.,* 445 F.3d 161, 173-74 (2d Cir. 2006).

In order to make out a *prima facie* case of retaliation,

> "the plaintiff must first present . . . evidence sufficient to permit a rational trier of fact to find [1] that []he engaged in protected participation or opposition . . . , [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."[123]

If plaintiff makes out a *prima facie* case of retaliation, the burden shifts to defendants to articulate, not prove, a legitimate, non-retaliatory reason for its adverse employment action.[124] If it does so, "the pattern of presumptions and burden shifts established by *McDonnell Douglas* . . . drops away, and the question in adjudicating the defendants' motion for summary judgment becomes simply whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by" a desire to retaliate against her for protected activity.[125]

In this case, plaintiff's alleged complaint to Ms. Cannady and any expression of concern on April 8 was protected activity. The decision makers knew of the April 8 comment, assuming as we must that it was made. Moreover, Piper is deemed to have known of the complaint to Cannady of retaliation for purposes of determining whether plaintiff has made out a *prima facie* case because all that is required for that limited purpose is "general corporate knowledge" of the

---

[123] *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted) (Title VII case).

[124] *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001) (Title VII retaliation claims are analyzed under *McDonnell Douglas* burden shifting analysis).

[125] *Tomassi v. Insignia Fin. Group,* 478 F.3d 111, 114-15 (2d Cir. 2007) (collecting cases).

protected activity.[126]  The close temporal proximity between the complaint to Ms. Cannady and the adverse action is sufficient evidence of causation at step one of the *McDonnell Douglas* analysis.[127] Plaintiff's termination was an adverse employment action.  In consequence, the Court assumes that there is a *prima facie* case of retaliatory termination, at least against Piper.[128]

Piper has offered a legitimate, non-retaliatory explanation for its actions. Accordingly, whatever presumptions or inferences arose out of the *prima facie* case "drop[] away." The question is simply whether the admissible evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable trier of fact to conclude that retaliatory animus was a motivating factor in the decision.

The key decision-maker at Piper, Finnerty, has made clear the basis for his decision. After looking into the matter, he determined that a number of partners had had a great deal of difficulty working with plaintiff, who had been insubordinate on more than one occasion.  There was ample basis for that conclusion.[129]  One need look no farther than the written accounts Rappaport and

---

[126]

    *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

[127]

    *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); *Pellegrino v. County of Orange*, 313 F.Supp.2d 303, 315 (S.D.N.Y. 2004).

[128]

    As will appear, that is not the case as against all of the individual defendants.

[129]

    Of course, it is unnecessary for an employer to establish that its proffered non-discriminatory reason for an adverse employment action was reasonable, as the civil rights laws do not alter an employer's freedom to make employment decisions for any reason as long as it does not do so on the basis of race and other proscribed employee characteristics. *DeMarco v. Holy Cross High Sch.*, 4 F.3d 16 (2d Cir. 1993); *Gobin v. New York City Health & Hosps. Corp.*, No. 04 Civ. 3207(WHP), 2006 WL 2038621, *6-7 (S.D.N.Y. July 19, 2006). That Piper had sensible reasons for firing plaintiff, reasons as to which the plaintiff has failed to raise a genuine issue of material fact, however, is pertinent at step three of the *McDonnell Douglas* analysis because it is evidence that a discriminatory motive played no

Orchis, furnished at the time. But it is not necessary to go even that far. Plaintiff's own e-mails and admissions confirm its reasonableness, a view that is underscored when one considers those portions of defendants' accounts of their interactions with her that plaintiff has not disputed. Few if any first-year associates in major law firms would get away with telling a partner, as plaintiff told Rappaport, that she would not draft the letters he asked for and that he should do it himself. Few if any would get away with showing out of her office a partner who had come to discuss a misunderstanding, as plaintiff did with Ochis. And few if any would get away with behaving as plaintiff did with Levine, especially her truculent response to Levine's request for information regarding the draft escrow instructions.

That said, it of course is theoretically possible that Finnerty's explanation for the decision was either entirely or partially false and that plaintiff's March 30 complaint to Cannady and her alleged comment at the April 8 meeting were motivating factors. But there is no evidence to support such an argument. Plaintiff's argument that her performance review was positive, though factually accurate, does not support her pretext argument because the reviews it reflects were made in September 2003, well before the episodes that led to plaintiff's termination.[130]

As an initial matter, there surely is no direct evidence. There is not a single document that even remotely suggests that Finnerty (or anyone else) acted out of a retaliatory motive born of the complaint to Cannady or the alleged comment at the meeting. Plaintiff did not testify to a single such statement by anyone at Piper. So her case in this respect rests entirely on the temporal

---

part in its decision. *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

[130]

Finnerty Decl. ¶ 7.

proximity between those events and her discharge. But there are three basic problems with this argument.

First, so far as the complaint to Cannady is concerned, there is no evidence that anyone at Piper other than Cannady even knew before the termination decision was made that plaintiff had voiced complaints of racial discrimination to Cannady. Moreover, it is undisputed that Cannady left for Texas shortly after her meeting with plaintiff and was gone for a week.[131]

While general corporate knowledge is sufficient to establish an employer's knowledge of protected activity in step one of the *McDonnell Douglas* analysis, it may not suffice to make out a causal connection at step three. The lack of knowledge of the protected activity on the part of the particular agents of the employer responsible for taking the adverse action is "evidence of a lack of causal connection, countering plaintiff's circumstantial evidence of proximity."[132] Thus, the fact that there is no evidence that Finnerty, Inskeep and Finnerty Jr. knew of plaintiff's complaint to Cannady is entitled to consideration in deciding whether the close temporal proximity between that complaint and plaintiff's termination is suggestive of a causal relationship.

Second, the significance of temporal proximity between protected activity and adverse employment action differs depending upon whether one is at step one or step three of the analysis. While close temporal proximity suffices to establish causation at step one, circuit courts and many district courts in our Circuit have held that it is insufficient to defeat summary judgment at step

---

[131] Morisseau Dep. 621:15-622:9; 997:23-998:2; Def. 56.1 St. ¶ 140.

[132] *Gordon,* 232 F.3d at 117; *see also Murray v. Visiting Nurse Services of N.Y.*, No. 05 Civ. 5462 (RJS), 2007 WL 3254908, *11 (S.D.N.Y. Oct. 31, 2007) (collecting cases); *Campbell v. Home Depot U.S.A., Inc.*, No. 03 Civ. 1421 (KMK), 2006 WL 839001, *14 (S.D.N.Y Mar. 30, 2006).

three.[133]  But the Court need not have adopted, and did not adopt, that categorical position in order to grant summary judgment against plaintiff on her retaliatory discharge claim.  Rather, it assumes *arguendo* that temporal proximity in some circumstances may suffice at step three, as for example where an employer's explanation is proved to be pretextual.  Thus, in every case, the question at step three is whether, considering all the evidence, including temporal proximity, in the light most favorable to the non-moving party, a reasonable trier of fact could conclude that a retaliatory motive was a factor in the decision.

Finally, it must be borne in mind that the road that led to plaintiff's termination began before plaintiff met with Cannady on March 30.  Rappaport complained to Finnerty of her behavior much earlier,[134] and Levine made the appointment to see Inskeep, with a view toward obtaining disciplinary action against plaintiff, on March 29.[135]  As the Court of Appeals made clear in *Slattery*,[136] "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job

---

[133]

E.g., *Arnett v. Univ. of Kansas,* 371 F.3d 1233, 1240-41 (10th Cir. 2004); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 820 n. 5 (8th Cir.1998); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997); *Murray v. Visiting Nurse Servs. of N.Y.,* No. 05 Civ. 5462 (RJS), 2007 WL 3254908, at *15 n.14 (S.D.N.Y. Oct. 31, 2007); *Brown v. Pension Bd.,* 488 F.Supp.2d 395, 410 (S.D.N.Y. 2007); *Simpson v. New York State Dept. of Civ. Serv.,* No. 02-cv-1216, 2005 WL 545349, at *21 (N.D.N.Y. Mar. 1, 2005); *Pelligrino v. County of Orange,* 313 F. Supp.2d 303, 316-17 (S.D.N.Y. 2004); *Bombero v. Warner-Lambert Co.,* 142 F. Supp.2d 196, 210 (D. Conn. 2000); *see Ofoedu v. St. Francis Hosp. and Med. Ctr.,* No. 3:04 CV 1707 (PCD), 2006 WL 2642415, at *25 (D. Conn. Sept. 13, 2006).

[134]

Def. 56.1 St. ¶ 46; *see also* Finnerty Decl. ¶ 23; Rappaport Dep. 163:6-18.

[135]

Levine Dep. 109:5-110:6; *see also* Finnerty Decl. ¶ 13.

[136]

*Slattery*, 248 F.3d 87.

actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."[137] The same logic applies here.

The basis for the Court's summary judgment ruling was that no reasonable trier of fact could find that the alleged protected activity – plaintiff's complaint to Cannady and her alleged comment at the April 8 meeting – was a motivating factor in Piper's decision to terminate her. Her behavior and the reactions of several Piper partners to it were sufficiently troublesome that no jury properly could find that either played any role in the decision.[138] Moreover, the decision as to what to do about plaintiff – that is, to insist that she either (a) acknowledge that there was a problem with her behavior and agree to work to correct it, or (b) discuss separation options – was made before plaintiff made the April 8 comment, assuming that she made it, and the process that led to the

---

[137]

    *Id.* at 95.

[138]

    It perhaps is well to emphasize that the Court in so holding does not rely on the *Price Waterhouse* defense, viz. that an employer that takes an adverse employment action against an employee in whole or in part for an improper reason nevertheless may avoid liability by proving that it would have taken the same action even in the absence of the improper motive. *See Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 161 (2nd Cir. 2001). Here, there is no evidence of a causal connection between the protected activity and the adverse employment action, so plaintiff's case fails at step three of the *McDonnell Douglas* analysis. There is no need to consider whether Piper would have made the same decision in the absence of a retaliatory motive, as the evidence is insufficient to permit the conclusion that a retaliatory motive was present.

    That said, even if the Court were to assume that the evidence were sufficient to permit the inference that a retaliatory motive played a role, the evidence of what Piper was entitled to regard as misbehavior by plaintiff is largely undisputed. It is so plain, in the Court's view, that defendants would be entitled to summary judgment on the ground that Piper would have terminated plaintiff even in the absence of any motive to retaliate for her complaint to Cannady. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

    It should be noted in this regard that the 1991 amendments to Title VII do not affect this conclusion. While they limited the *Price Waterhouse* defense to the extent of foreclosing only damage awards, but not attorneys' fees, against employers in disparate treatment cases, they do not apply to retaliation claims. *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000).

discussion began before the Cannady meeting. When plaintiff subsequently declined to accept either option offered by Piper, she was terminated pursuant to a decision that had been made beforehand. There simply is not sufficient evidence of a causal connection between protected activity and her termination.

3.     *The Post-Employment Retaliation Claim*

The analysis of the post-employment retaliation claim follows the same pattern, bearing in mind that the only alleged adverse action as to which there is any arguably admissible evidence is the possible mention by someone at Piper to the Second Department authorities of possible unauthorized practice of law by plaintiff.

The first step is to determine whether and to what extent plaintiff has made out a *prima facie* case.[139]

The EEOC charge and, as noted above, the March 30, 2004 complaint to Cannady and plaintiff's comment at the April 8, 2004 meeting all were protected activity. Further, for purposes of step one of *McDonnell Douglas,* Piper is presumed to have been aware of them. The Court assumes *arguendo* that an allegation of this sort to the Second Department might constitute an adverse employment action. On that assumption, the existence of a *prima facie* case would depend upon whether there is sufficient evidence of a causal connection between the protected activity and the adverse action.

---

[139]    There is no direct evidence of retaliatory motive for any of Piper's actions with respect to the plaintiff's bar admission.

There plainly is not in the case of the EEOC charge. Plaintiff applied for admission to the Bar in June 2004. A member of the Committee on Character and Fitness interviewed plaintiff on December 6, 2004. The EEOC charge was filed on February 5, 2005. On February 17, 2005, Piper's counsel advised the Committee that it did not "believe that [plaintiff's] conduct at the firm raises any issue that should disqualify her from admission to the bar." In the absence of evidence that Piper raised a question of unauthorized practice of law by the plaintiff between learning of the EEOC charge on or after February 5 and before February 17 – and there is none – no rational trier of fact could find any connection between the EEOC charge and any complaint Piper made.

The chronology at least admits of the theoretical possibility of a connection between the March 30 and April 8, 2004 events and whatever communication Piper had with the Second Department. But there is no direct evidence suggesting that Piper raised that question with the Appellate Division to retaliate against plaintiff for her complaint and comment to Cannady and Kaback, respectively, so plaintiff necessarily must fall back on chronology alone in order to make out a *prima facie* case.

In order to infer a causal connection between protected activity and an adverse employment activity on the basis of timing alone, the temporal proximity must be "very close."[140] But there is no evidence as to when any such communication may have taken place save that plaintiff did not apply for admission until June 2004. Hence, any communication about unauthorized practice that may have occurred could have been made at any time in the period from June 2004 until April

---

[140] *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (citing with approval decision holding three month interval too long to permit inference).

2005, the date of the Character Committee report or, at least, February 2005 when Piper informed the Second Department that it had no issue with plaintiff's admission to the Bar.

It was plaintiff's burden to offer admissible evidence of a "very close" temporal proximity between the protected activity and that communication. As any such communication could as easily have occurred as late as February or even April 2005, ten or twelve months after the events of March-April 2004, plaintiff cannot be regarded as having carried her burden unless it could be said that such an interval would have been "very close." While the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,[141] the weight of authority supports the view that ten or twelve months is too long.[142] Accordingly, plaintiff has failed to make out a *prima facie* case because there is not evidence sufficient to permit an inference of a causal connection between the Cannady and Kaback incidents in March-early April 2004 and whatever mention of possible unauthorized practice, whenever it was made, to the Second Department.

---

[141]

*Gorman-Bakos v. Cornell Coop. Ext. of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir. 2001).

[142]

*E.g., Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (3 ½ months too long); *Garrett v. Garden City Hotel, Inc.,* No. 05-CV-0962 (JFB), 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (more than 2 months too long) (collecting cases); *Diaz v. Weill Med. Ctr. of Cornell Univ.,* No. 02 Civ. 7380 (AJP), 2004 WL 285947, at *22 (S.D.N.Y. Feb. 13, 2004) (6 months too long); *Ashok v. Barnhart,* 289 F. Supp.2d 305, 314 (E.D. N.Y. 2003) (more than several months too long); *Sussle v. Sirina Protection Sys. Corp.*, 269 F. Supp.2d 285, 316-17 (S.D.N.Y. 2003) (4 months or even less too long); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y.1999) (collecting cases to show that "claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation."); *Castro v. Local 1199, Nat'l Health & Human Servs. Employees Union*, 964 F. Supp. 719, 728 (S.D.N.Y. 1997) (one year too long).

### III.     The Motion to Alter or Amend the Judgment

Having laid out the basis for the granting of defendants' motion for summary judgment dismissing the complaint, the Court turns to plaintiff's claim that the decision should be set aside  because the Court (1) applied an incorrect legal standard in determining that plaintiff had failed to satisfy the "qualification" prong of a *prima facie* case, (2) did not review documents submitted in connection with a motion to compel discovery, specifically DI 56, 63 and 65, in granting summary judgment against plaintiff, and (3) failed to recognize that deposition testimony submitted by defendants in support of the motion for summary judgment contravened defendants' Rule 56.1 statement and witness declarations.

The first and third arguments may be dealt with swiftly in light of the foregoing discussion.  As demonstrated above, the Court did not in fact determine that plaintiff failed to satisfy the "qualification" prong of a *prima facie* case – it assumed that she had, but dismissed because plaintiff failed at step three of the *McDonnell Douglas* framework.  Likewise, there is no basis for the assertion that there were material inconsistencies between the deposition testimony and defendants' Rule 56.1 statement and witness declarations save plaintiff's inadmissible statements of personal belief and speculation.  There remains only the contention that the Court erroneously failed to consider documents submitted in connection with an earlier motion that were not included in the summary judgment papers.

*A.      The Record Considered on a Motion for Summary Judgment*

Motions for summary judgment in this court are governed not only by Federal Rules

of Civil Procedure, but also by S.D.N.Y. CIV. R. 56.1.  The latter provides in relevant part as follows:

> "(a)      Upon any motion for summary judgment . . . , there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement may constitute grounds for denial of the motion.

> "(b)      The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

> "(c)      All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

> "(d)      Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."

In view of the provision stating that all material facts set forth in the movant's Rule

56.1 statement are deemed admitted unless controverted by averments in the opposing party's

responsive statement that are supported by citations to admissible evidence, Rule 56.1 necessarily

means that the court need not search the entire file in resolving a summary judgment motion.  It may

confine its review to the evidence cited by the parties.  Hence, where a party against whom summary

judgment is sought fails entirely to respond to the motion, the court need ensure only that the

averments in the movant's Rule 56.1 statement are supported by evidence and show an absence of

a genuine issue for trial.[143]

---

[143]      *See Vermont Teddy Bear Co. V. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d. Cir 2004); *Giannullo v. City of New York*, 322 F.3d 129, 143 n.5 (2d Cir. 2003).

This view is consistent with both the purpose of Rule 56.1 and the practicalities of modern litigation. "Rules" such as this "are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'"[144] This is especially important in an era in which broad discovery, electronic storage and production of documents, high-speed copying, and other technological innovations have seen court records in many cases grow to astounding sizes. As Judge Easterbrook has observed, "'[j]udges are not like pigs, hunting for truffles buried' in the record."[145] Where a non-moving party defaults on a properly supported motion for summary judgment, the court is not obliged to sift through a large court record against the possibility that it will find something to warrant denial of the motion that the non-moving party has not bothered to call to its attention.

Accordingly, S.D.N.Y. CIV. R. 56.1 permits a judge dealing with a motion for summary judgment to limit review to admissible evidence properly cited in the parties' Rule 56.1

---

[144]

   *N.Y. State Teamsters Conf. Pension & Retirement Fund v. Express Servs., Inc.,* 426 F.3d 640, 648-49 (2d Cir. 2005) (quoting *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001)).

[145]

   *Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir.2002), *cert. denied,* 539 U.S. 941 (2003) (*quoting United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) (per curiam)).

statements.[146]  Hence, any limitation of the Court's review to the materials submitted on the motion for summary judgment would have been entirely proper.

B.      *In Any Case, the Documents Relied Upon Would Not Raise a Genuine Issue of Material Fact*

Plaintiff's memorandum refers specifically to three groups of documents, all said to have been from the file of Denise Cortis, Piper's human resources chief, which she says bear on her discrimination and retaliatory discharge claims.[147]  The first was attached to plaintiff's affidavit in support of a motion to compel,[148] the second to a declaration of one of defendants' attorneys in opposition to that motion;[149] and the third to plaintiff's unsworn reply memorandum in support of the motion.[150]

---

[146]

Local Rule 56.1 is within the Court's authority in this respect. *See N.Y. State Teamsters Conf.,* 426 F.3d at 648-49 (stating that "district courts have the authority to institute local rules governing summary judgment submissions" and upholding strict application of local rule deeming admitted facts uncontroverted by statements of opposing party supported by specific citations to record evidence allegedly raising factual issue); 12 Charles Alan Wright, et al., Federal Practice and Procedure: Civil 2d § 3153, at 516-35 (1997).

[147]

Plaintiff does not contend that there is anything in the entire record that bears on her post-employment termination and breach of contract claims save what was submitted on the summary judgment motion.

[148]

DI 149, at 5 (referring to DI 56).

[149]

*Id.* (referring to DI 63).

[150]

*Id.* (referring to DI 65).

1.     *Group 1 – Attachments to Plaintiff's Moving Affidavit (DI 56)*

Plaintiff's earlier affidavit attached six exhibits consisting mainly of the privilege log produced by defendants' counsel and correspondence between the attorneys.  Apart from a letter by plaintiff, written after her termination, to defendants' counsel,[151] there is nothing in this entire filing of any relevance to the summary judgment motion.  While the letter makes various accusations, it is unsworn.  Hence, any relevant statements it might contain are inadmissible, at least because they hearsay.

2.     *Group 2 – Attachments to Declaration of Defendants' Counsel (DI 63)*

Plaintiff points next to five documents that were attached to a declaration of one of the defense lawyers in opposition to plaintiff's motion to compel discovery.[152]   One of these documents was submitted by defendants in support of their motion for summary judgment and thus was considered.

The first (DI 65, Ex. 5) is a memorandum of an interview of Sarah Cannady that was conducted by Piper lawyers after plaintiff left the firm.  Plaintiff points to two statements in the following passage that were attributed to Ms. Cannady:[153]

---

[151]
DI 56, Ex. E.

[152]
DI 149, at 11-12, 18-19 (referring to Brill Decl. (DI 63) Exs. 2-6).

[153]
DI 149, at 11, 17-18 (referring to DI "63:5, pp. 3-4" and DI "63:6, p. 3," which in fact is Brill Decl. (DI 63) Ex. 5, at 6-7).

The Court assumes without deciding that both the memorandum and Ms. Cannady's statements would have been admissible over hearsay objection under FED. R. EVID. 801(d)(2)(D).

"Charlene told Sarah that Doug was engaging in unethical lawyering on the Cantor cases. When Charlene conveyed this information to Sarah she would say that she was 'happy to be a sounding board,' but she would direct practice-related concerns to Karen Litscher Johnson. Charlene asked Sarah to tell Doug to 'back off and leave her alone.' In Sarah's view this lack of judgment indicated that Charlene was not fit for the law firm world. Sarah felt that she reported to Doug in some respects as he runs the summer program along with Heidi Levine. Moreover, Doug is a fairly seasoned partner. Nevertheless, Sarah had a discussion with Doug concerning Charlene. Sarah heard that Charlene screamed at Doug Rappaport in the office. Doug advised Sarah that this incident occurred. Sarah told Charlene that she talked to Doug and conveyed her concerns. Sarah advised her that Doug was aware of her position on the matters concerning her.

. . .

"In September 2003, Sarah recalls a discussion with Charlene that caused her some concern. Charlene had some questions about how to answer questions regarding the lack of racial diversity in the firm that she anticipated would be asked by Harvard students who were members of the Black Law Students Association ('BLSA'). Charlene did not seem satisfied with Sarah's responses. Consequently, Peter Ellis, an African-American associate from the Chicago office (not a Harvard law school graduate) was selected by Peter Bynoe, (African-American partner, Harvard alumni, Chicago office) to participate on the panel. Charlene asked Sarah why she wasn't selected to participate as the firm's representative on the Harvard BLSA panel. Sarah advised Charlene that Peter Bynoe had made the determination and questions should be directed to him as she was not privy to the reasons for his decision. Sarah did indicate that she would not have selected Charlene to participate as she exhibited open hostility towards her law firm experience."[154]

This document would add nothing to plaintiff's evidentiary showing on the motion for summary judgment. As it is unsworn, it is not admissible for the truth of the matters stated and thus could not properly be considered on the discrimination claim even if it somehow were regarded as evidence of disparate treatment. And while this document, to whatever extent it might evidence protected activity by plaintiff, would be admissible to that extent on a retaliation claim, there is simply nothing to support the view that there was any connection between plaintiff's alleged

---

[154] Brill Decl. (DI 63) Ex. 5, at 6-7.

statements to Cannady in September 2003 and her firing in April 2004, following Levine's complaint and Finnerty's consideration of the experiences of other partners. Among other things, close temporal proximity is lacking, so this adds nothing to plaintiff's *prima facie* case, which the Court in any event has assumed in her favor. And there is no evidence that Finnerty or anyone else at Piper (other than Cannady) knew of this incident before plaintiff was fired, so it adds nothing at step three of the *McDonnell Douglas* analysis.

The second document to which plaintiff refers is a similar interview memorandum, this one conducted with Karen Litscher Johnson.[155] Plaintiff focuses on the following statement attributed to Ms. Johnson: "Charlene had previously mentioned by e-mail that she thought that different standards were being applied to her reviews. (See emails exchanged 3/3 - 3/15 . . . )"[156]

Again, this document, even if it should have been considered, would have added nothing to the disparate treatment claim because plaintiff's belief would not be competent evidence. The document would not have been admissible on the disparate treatment claim. And while the fact that plaintiff made this complaint would have been admissible for non-hearsay purposes on the retaliation claim, the fact remains that there still would have been nothing to support a conclusion that there was a causal connection between protected activity (in this case, the statement to Johnson) and the decision to terminate plaintiff save for temporal proximity. For all the reasons articulated above, that would have been insufficient on the facts of this case to create a genuine issue of material fact.

---

[155] DI 149, at 12 (referring to Brill Decl. (DI 63) Ex. 6).

[156] *Id.* (referring to Brill Decl. (DI 63) Ex. 6, at D001361).

The third document to which plaintiff refers is a similar interview memorandum, this one conducted with Denise Cortis.[157] But that document, if considered, would support defendants, not plaintiff. It indicates that Finnerty wanted to fire plaintiff in mid-March and therefore quite clearly before the March 30 Cannady meeting and the alleged April 8 comment to Finnerty and Kabeck.

3.      *Group 3 – Other Documents Allegedly from the Cortis File (DI 65)*

Plaintiff relies most heavily on a group of documents, said to have been from Ms. Cortis' file, that were attached to plaintiff's unsworn reply in support of her motion to compel.[158] While plaintiff did not authenticate the documents, the Court assumes for purposes of discussion their authenticity.

The documents consist of a number of e-mail strings involving communications between and among lawyers at Piper, in some cases including plaintiff; three pages of unattributed and unsigned handwritten notes bearing the date "3/30/04;"[159] one typewritten page labeled by hand "Sarah Cannady's Notes;"[160] three pages of unattributed and unsigned handwritten notes bearing the

---

[157]
    DI 149, at 18-19.

[158]
    DI 65.

    DI 65 contains also, as Exhibits B and C, copies of a letter from the firm's counsel to the EEOC and plaintiff's evaluation of April 2004, respectively.

[159]
    DI 65, Ex. A, at D002745-47.

[160]
    *Id.* at D002751

date "4/8/04;"[161] and a handwritten telephone message slip.[162]  Some of these documents, it should

be added, were submitted by defendants in support of their motion for summary judgment and thus

were considered.

      None of the e-mails was sworn.   In consequence, statements by plaintiff are

admissible only to prove the fact that they were made.[163]  The same is true concerning statements by

Piper personnel except to the extent that plaintiff relies upon them against the defendants.  In that

event, the statements are not hearsay by declarants.[164]

      That said, the e-mails add only that plaintiff in early March 2004 complained to Ms.

Cannady about her reviews, albeit without suggesting in her e-mails that she thought that race or

gender had anything to do with the matter.[165]

      This leaves as potentially relevant only the two sets of unattributed handwritten notes

and the typewritten page labeled "Sarah Cannady's Notes."  Plaintiff relies on the handwritten notes

dated April 8, 2004, which she assumes to have been taken by Denise Kaback, to show that plaintiff

---

[161]

    *Id.* at D002901-03.

[162]

    *Id.* at D002904.

[163]

    An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule, FED. R. EVID. 803(6).  *See United States v. Stein,* No. S1 05 Crim. 0888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007).

[164]

    "[T]he proponent of an admission by a party opponent must establish the declarant's competence; office or plant gossip does not become admissible simply because it is put into the mouth of someone whose statements are not subject to hearsay objection."  *Thomas v. Stone Container Corp.,* 922 F. Supp. 950, 957 (S.D.N.Y. 1996) (citing *Litton Sys., Inc. v. Am. Tel. & Tel. Co.,* 700 F.2d 785, 816-17 (2d Cir. 1983), *cert. denied,* 464 U.S. 1073 (1984)).

[165]

    DI 65, Ex. A, at D002753-54.

spoke to Levine about Rappaport's handling of the VCF cases and "that Levine warned [plaintiff] that reporting the matter to the Firm could hurt [her] career."[166]  This adds nothing to plaintiff's deposition testimony about her discussion with Levine.[167]  Defendants admit that Morisseau discussed Rappaport with Levine, though they do not admit that she told Morisseau that reporting it could hurt her career.  Plaintiff relies also on the handwritten notes dated March 30, 2004, which she assumes to be have been taken by Sarah Cannady at her meeting with plaintiff,[168] and the typewritten page labeled "Sarah Cannady's Notes."  But there is nothing in the handwritten notes helpful to plaintiff that was not in her deposition account of that meeting, which defendants placed before the Court on the motion.[169]  And the typewritten page, assuming it is what plaintiff supposes it is, evidence only that Cannady, once she returned from Texas in early April 2004, assisted in compiling evidence of problems that lawyers at Piper had had with plaintiff.  As defendants do not dispute the fact that such an effort was made, this document would add nothing to the overall picture.

In sum, then, even if these documents were part of the record that the Court was obliged to consider on the summary judgment motion, they would not have altered the result.

---

[166]  DI 149, at 12.

[167]  *See* Morisseau Dep. 373:2-15.

[168]  DI 149, at 12.

[169]  Morissseau Dep. 987:24-998:12.

### *IV.    Recusal*

Following the filing of plaintiff's Rule 59(e) motion, she moved also "for an order granting Plaintiff leave to file a recusal motion, that the recusal motion is decided before any decision is made on Plaintiff's pending Rule 59(e) motion, and for leave to conduct discovery in support of her recusal motion."[170]  She sought until January 2, 2008 to file the threatened motion.

The Court denied plaintiff's motion on the grounds that (a) no leave of court was required to file a recusal motion, (b) no basis for conducting discovery had been shown, and (c) there was no reason to delay disposition of the Rule 59(e) motion in light of the apparent lack of merit in the threatened recusal motion, coupled with the failure to file timely and sufficient papers under 28 U.S.C. § 144.[171]  In the event, no recusal motion ever was filed.  Nevertheless, recusal would not have been appropriate.

Plaintiff referred first to a newspaper report indicating that the undersigned testified as a character witness in a professional disciplinary proceeding against a retired former partner in which he reportedly said that "he suspected [that the former partner's admitted misconduct was attributable at least in part to his] longstanding career disappointment and his 'dynamic, ambitious, and aggressive' wife, whose work associated her with extremely wealthy people, [and] created 'tremendous pressure' on [the former partner] 'to provide more for his family consistent with [his wife's] expectations [and] desires than he could do given where he was professionally.'"[172]  This,

---

[170]    DI 150-51.

[171]    DI 152.

[172]    DI 151 ¶¶ 5-6 & Ex. A.

plaintiff implied, demonstrated "hostility to Plaintiff's cause of action" because (a) the foregoing reported statement evidenced "hostility against another woman [presumably the retired partner's wife] involved in a prior disciplinary actions [*sic*] against members [*sic*] of the New York state bar", (b) plaintiff claims here that DLA Piper retaliated against her because she was a "whistle blower" with respect to alleged professional misconduct by someone at that firm, and (c) plaintiff had disclosed to the New York Family Court in a proceeding brought against plaintiff by one of her relatives that the relative had retaliated against plaintiff.[173]

      Second, plaintiff referred to the Court's supposed errors in ruling on the defendants' summary judgment motion and other unspecified matters in this case.[174]

      Finally, in a subsequent document[175] plaintiff stated that (a) David Nachman, a former associate at Paul, Weiss, Rifkind, Wharton & Garrison and the husband of defendant Amy Schulman, is a "central figure" in a non-profit organization called New Perimeter, and (b) the

---

[173]    *Id.* ¶¶ 1, 4-5.

[174]    *Id.* ¶¶ 5, 7.

[175]    DI 153.

    The document in fact was not a declaration because it did not comply with 28 U.S.C. § 1746.

"Southern Center" – presumably a reference to the SCHR – participates in New Perimeter.[176] She went on to elaborate on her disagreement with a variety of rulings in this action.[177]

None of these circumstances – even if true, even if plaintiff had moved for recusal, and even if any such motion had complied with the statutory requirements – would warrant recusal under either of the two statutes that govern the recusal of federal judges, Sections 144 and 455 of the Judicial Code.[178]

So far as Section 144 is concerned, plaintiff never filed the requisite affidavit sufficiently alleging "that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party." Nor did she file the requisite certificate of counsel stating that the affidavit is filed in good faith. Her papers, such as they are and assuming their accuracy, do not allege a personal bias or prejudice.[179] She has not established that

---

[176]

> *Id.* at 2.
>
> Plaintiff first alleged a connection between Piper and New Perimeter in her deposition. *See* Morisseau Dep. 953:10-24.

[177]

> DI 153 at 3-4.

[178]

> 28 U.S.C. §§ 144, 455.

[179]

> As the Supreme Court said in *Liteky*, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555-56 (1994).
>
> It should be noted also that the determination of whether such an affidavit is timely and legally sufficient is made by the judge whose recusal is sought. *See, e.g., Berger v. United States*, 255 U.S. 22, 32, 36 (1921); *LoCascio v. United States*, 473 F.3d 493, 499 (2d Cir. 2007) ((quoting *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.,* 572 F.2d 953, 958 (2d Cir. 1978), *cert. denied,* 439 U.S. 1072 (1979)) ("'a judge has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not to disqualify himself unnecessarily . . .'").

plaintiff filed them as soon as practical after learning of the facts.[180]  Nothing plaintiff has said, even assuming its accuracy, would warrant recusal.

      Section 455(a) requires that a judge recuse when "an objective, disinterested observer fully informed of the underlying facts [would] entertain significant doubt that justice would be done absent recusal."[181]  Moreover, the statute implicitly requires that an application for recusal be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."[182]

      For the reasons set forth above, plaintiff has failed even to allege that the facts upon which she rests her complaints (the summary judgment ruling aside) only recently came to her attention.  In any case, plaintiff's failure to file any motion for recusal between initially raising the issue on December 20 and the date of this decision independently waived any claim she may have

---

[180]

    *See, e.g., Apple v. Jewish Hosp. and Medical Center,* 829 F.2d 326, 333 (2d Cir.1987) ("It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."); *Lamborn v. Dittmer*, 726 F. Supp. 510, 514 (S.D.N.Y. 1989) (same); *Cranston v. Freeman,* 290 F. Supp. 785, 816 (N.D.N.Y. 1968) (Section 144 motion untimely when brought after commencement of trial), *rev'd on other grounds,* 428 F.2d 822 (2d Cir. 1970).

    The ten day rule stated in the statute no longer is applied literally, as 28 U.S.C. § 138 abolished terms of court. *See* 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3551 (2007).

[181]

    *In re Aguinda,* 241 F.3d 194, 201 (2d Cir. 2001) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)).

    "Where a case, by contrast, involves remote, contingent, indirect or speculative interests, disqualification is not required." *Id.*

[182]

    *Apple,* 829 F.2d at 333.  *Accord, e.g., United States v. Brinkworth,* 68 F.3d 633, 639 (2d Cir. 1995).

had. And even if she had timely raised her contentions, none of plaintiff's allegations would cause an objective, reasonable observer to doubt the impartiality of the Court.

*Conclusion*

This is a sad case. Plaintiff, according to her academic record and Piper's internal evaluations, appears to be a talented person. But the record indisputably shows that she had serious problems working with others during her employment by Piper.

New York is an employment-at-will state. As judges frequently and correctly instruct juries, an employer, in the absence of a contract of employment, can fire an employee for a good reason, a bad reason, or no reason at all save that it may not do so out of racial or other proscribed motives or to retaliate for an employee's protected activity.

In this case, Piper was entirely with its rights in deciding that plaintiff's behavior was unacceptable unless plaintiff's race or her complaints of racial discrimination was a motivating factor in the firm's decision. There was no admissible evidence from which a jury reasonably could find that either played a role. Accordingly, plaintiff was entitled to summary judgment dismissing the complaint. Nothing plaintiff has advanced on this motion warrants any different result.[183]

---

[183]    Her argument that there was circumstantial evidence of breach of contract (DI 149, at 34-35) would be quite beside the point, even if it were correct. The relief sought for the alleged breach of contract is damages for lost wages and benefits and emotional distress. Am Cpt ¶ 139. As the Court noted, plaintiff has been precluded from offering evidence of any economic injury as a sanction for her refusal to comply with a court order requiring production of documents, thus foreclosing recovery of lost wages and benefits. Absent circumstances not present here, damages for emotional distress are not available for breach of contract. *E.g., Wehringer v. Standard Sec. Life Ins. Co.,* 57 N.Y.2d 757, 759, 454 N.Y.S.2d 984 (1982); *Smith v. Chase Manhattan Bank, USA, N.A.,* 293 A.D.2d 598, 741 N.Y.S.2d 100 (2d Dept. 2002). Thus, plaintiff could not establish damages even if there had been a breach of contract. As damages are an element of a claim for breach of contract, *e.g.,*

Plaintiff's motion to alter or amend the judgment [docket item 148] is denied in all respects.

SO ORDERED.

Dated:      January 23, 2008

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F.Supp.2d 258, 270-71(S.D.N.Y. 2004), plaintiff's contract claim necessarily fails.